Rockingham
No. 2006-872

THE STATE OF NEW HAMPSHIRE

v.

MICHAEL SPINALE

Argued: October 25, 2007
Opinion Issued: November 30, 2007

458

*Kelly A. Ayotte*, attorney general (*Susan P. McGinnis*, assistant attorney general, on the brief and orally), for the State.

*Henry F. Spaloss*, of Nashua, on the brief and orally, for the defendant.

DUGGAN, J. The State appeals the order of the Superior Court (*Coffey*, J.) setting aside the jury's guilty verdict against the defendant, Michael Spinale, on one charge of robbery. *See* RSA 606:10, III (2001). The trial court concluded that no rational juror could have found the defendant guilty beyond a reasonable doubt. We reverse and remand.

## I

The following facts were adduced at trial. On July 21, 2004, Kevin James was working as an attendant at the Simco Parking Lot outside the Happy Hampton Arcade in Hampton. The parking lot was busy due to a fireworks show scheduled to begin at 9:30 p.m. in a beach area approximately 100

yards from the rear of the lot. A booth located at the front of the parking lot provided lighting to James while he stood or sat outside it to collect parking fees and provide tickets to drivers entering the lot. James held the money and ticket stubs in the pockets of an apron. James' supervisor, Jake Hume, remained inside the arcade for most of the night, but occasionally went outside to direct traffic and collect money from James.

Shortly before 9:00 p.m., three men pulled into the parking lot and gave James "a hard time" about the high parking fees and the location of their parking spot. James radioed Hume and asked him to come outside. When Hume arrived, James informed him of what had occurred and pointed to the men as they were walking towards the beach. Officer James Tuttle of the Hampton Police Department, who was on motorcycle patrol, arrived shortly thereafter, but did not see the men. After Officer Tuttle left, Hume informed James that he would call the police if the men returned to cause additional problems.

At approximately 10:44 p.m., after the fireworks had finished, James observed the same three men walking towards him. One of the men passed James and walked towards their car. A second man, later identified as Corey Daniels, stood five or six feet to the side of James, while the third man, later identified by James as the defendant, continued to approach him. The defendant waited while James finished with another customer, and then pulled out a knife, pressed it against James' neck, and demanded all of his money. Initially, James thought that the defendant was joking, but after a couple seconds, realized he was serious. James then noticed a vehicle driving towards them. He told the defendant that the police were coming. When the defendant and Daniels turned to look behind them, James ran behind the booth and watched the defendant and Daniels run back to their vehicle and drive away. As the vehicle passed James, he wrote down the type of vehicle, Chevy Blazer, and its license plate number, 90AX02, on a ticket stub.

James radioed Hume immediately. Hume arrived and James informed him that the same three men who had given him a hard time about the parking fees had attempted to rob him. Before they could call the police, however, James and Hume observed Officer Tuttle patrolling the lot.

James and Hume described the three individuals to Officer Tuttle. James described the defendant, whom Officer Tuttle listed in his report as "Suspect #1," as a white male, five feet five to five feet six inches in height, twenty to twenty-five years of age, 180 to 210 pounds, with dark hair, wearing a black shirt and possibly jeans, and the driver of the Blazer. He also informed Officer Tuttle that he did not "see any facial hair at the time." James described Daniels, the man standing to the side and listed as "Suspect #2" in Officer Tuttle's report, as a white male, five feet eight to

five feet nine inches in height, in his early twenties, with a stocky build and dark hair, and wearing a white shirt and jeans. He described the man who had immediately walked to the vehicle, listed as "Suspect #3" in Officer Tuttle's report, as a white male, five feet eight to five feet nine inches in height, in his early twenties, and wearing a blue Iverson basketball jersey with the number three on it. Hume, who did not see the alleged robbery but had observed the individuals walking away from the earlier confrontation, described "Suspect #2" to Officer Tuttle as wearing a white shirt and having a goatee, and "Suspect #3" as being tall and wearing a blue Iverson tank top with the number three on it.

The police later identified the defendant as the owner of a Chevy Blazer with Massachusetts license plate number 90AX02. Detective Lynne Charleston of the Hampton Police Department subsequently obtained a general description of the defendant from his driver's license, compared it to the description of "Suspect #1" in Officer Tuttle's report, and concluded that the descriptions "somewhat fit." She then located a photograph of the defendant, which was taken on June 6, 2004, and depicted the defendant as having a goatee. Using this photograph, Detective Charleston assembled a two-page photographic array containing photographs of fifteen other men similar in appearance to the defendant. The defendant's photograph was placed on page two of the array, while a photograph of Daniels, "Suspect #2," was placed on page one. Daniels' photograph was included even though, at the time, he was not a suspect in the robbery.

On August 26, 2004, Detective Charleston showed the two-page array to James. James recognized none of the photographs on page one, but, "almost immediately" and with "no contemplation," identified the defendant as the person who tried to rob him. James testified that, "as soon as [he] saw" the array, he was "100 percent sure" that the defendant was the man who robbed him. Detective Charleston asked James to sign, date, and indicate how he knew the defendant on the array. Accordingly, James circled the defendant's photograph and wrote: "This looks like the kid who held the knife to me the night in the parking lot." Thereafter, the defendant was charged with robbery.

During trial, James identified the defendant as the robber with "100 percent" certainty. When asked by defense counsel to estimate the defendant's current height and weight, James testified that the defendant was approximately five feet seven inches or five feet eight inches in height, and 180 pounds. After the State rested, the defendant moved to dismiss, arguing, among other things, that the identification evidence had been insufficient to support a finding beyond a reasonable doubt that the defendant had committed the robbery. The trial court denied the motion,

ruling that the State had made a *prima facie* case on identification, and that the issue of identification was for the jury to decide.

Thereafter, the defendant testified and presented two witnesses, Danielle Gagne and Jen Elwell, who had been his friends for approximately six years. Gagne and Elwell testified that they met the defendant and the other two men in the beach area before the fireworks began. After the fireworks, Gagne and Elwell walked towards their vehicle with the three men. Gagne testified that the last time she saw the defendant, he was "walking to his car." Elwell testified that she waved at the men as they were getting into the defendant's car, and did not see a parking lot attendant.

The defendant testified that he was at Canobie Lake with the other two men when Elwell called and asked them to come to Hampton beach. He parked in the Simco lot, but encountered no problems with the parking attendant. He denied meeting a parking attendant in the parking lot when he left after the fireworks, and denied that either he or any of his companions had a knife or confronted an attendant. The defendant testified that he was currently twenty-one years of age, six feet two-and-one-quarter inches in height, approximately 250 pounds, and had never shaved his goatee since he grew it approximately eight years before. He also stated that, at the time of the incident, he weighed approximately 230 to 240 pounds. The defendant admitted that he owns a black Chevy Blazer with Massachusetts license plate number 90AX02.

The jury returned a verdict of guilty. The defendant later filed a motion for judgment notwithstanding the verdict (JNOV). He argued that the jury was "manifestly" mistaken as to James' identification of the defendant, and, therefore, the verdict should be set aside and a judgment of acquittal entered. At a subsequent hearing, the defendant contended that there was "an overwhelming contradiction in" James' testimony such that there was "insufficient evidence to find beyond a reasonable doubt that [he] was the perpetrator." He asked the trial court to either rule the evidence insufficient and enter a judgment of acquittal, or find that the jury made a plain mistake and order a new trial.

The trial court set aside the verdict and granted a new trial. In so doing, the court cited the legal standard concerning sufficiency of evidence; indicated that it "agree[d] with the defendant's sufficiency of the evidence argument"; and concluded that "no rational juror could have found [the defendant] guilty beyond a reasonable doubt on the evidence presented at trial." Specifically, the trial court stated:

> The description Mr. James gave to Officer Tuttle on the night of his attack—presumably the most reliable description available—

simply varies too greatly from [the defendant]'s actual physical attributes to conclude that he was the attacker. On cross-examination, Mr. James attempted to credit the difference between the defendant's actual height and his description to Officer Tuttle to bad estimation skills. This may be so, but his explanation does little to eliminate the reasonable doubt surrounding his later identifications. Further, Mr. James conceded that there was no difference in [the defendant]'s appearance at trial and the photo from Det[ective] Charleston's array, taken *before* the attack, which showed him wearing a goatee. The obvious conclusion is that [the defendant] was in fact "Suspect #2," the stocky, taller man standing behind "Suspect #1," the shorter attacker with no facial hair.

Based upon these findings, the trial court "decline[d] to enter a judgment of acquittal[,]" and instead, set aside the defendant's conviction and granted a new trial.

The State urges us to reverse the trial court's decision and remand for resentencing. It contends that the trial court improperly second-guessed the jury's verdict and made credibility determinations in concluding that the identification evidence was insufficient. The State maintains that there was sufficient direct and circumstantial evidence of identification for a rational juror to find that the defendant was the perpetrator, and thus, the evidence was sufficient to support the conviction. The State notes that while the trial court did not explicitly grant the motion for JNOV and enter a judgment of acquittal, as is the normal practice where a court finds insufficient evidence to support a conviction, see, e.g., *State v. O'Neill*, 134 N.H. 182, 184-85 (1991), by finding the identification evidence insufficient, the trial court, in effect, granted the JNOV motion. Thus, the State emphasizes that a retrial of the defendant in these circumstances would violate the defendant's double jeopardy rights. At oral argument, the State indicated that, because the trial court granted the defendant a new trial, the court may not have found the evidence insufficient, but, rather, found the jury's verdict to be against the weight of the evidence. On that theory, the State argues that the trial court erred because the evidence was not overwhelmingly in favor of the defendant.

## II

In his initial motion for JNOV, the defendant requested that the trial court find that the identification evidence was insufficient, set aside the verdict, and enter a judgment of acquittal notwithstanding the verdict. At the hearing, however, by asking the trial court to set aside the verdict and

grant a new trial, the defendant appears to have argued that the verdict was conclusively against the weight of the evidence. It is unclear whether the trial court found the evidence to be insufficient or conclusively against the weight of the evidence. Accordingly, we evaluate the trial court's order on both grounds.

The often-confused concepts of weight and sufficiency of the evidence are distinct and are governed by different standards. *Broderick v. Watts*, 136 N.H. 153, 158-59, 162-63 (1992); *O'Neill*, 134 N.H. at 184-85; *Glasper v. State*, 914 So. 2d 708, 727 (Miss. 2005); *see also Tibbs v. Florida*, 457 U.S. 31, 41-43 (1982); *State v. Thompkins*, 678 N.E.2d 541, 546-48 (Ohio 1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith*, 684 N.E.2d 668 (Ohio 1997); 29A AM. JUR. 2D *Evidence* § 1430 (1994); 5 W. LAFAVE ET AL., CRIMINAL PROCEDURE § 24.6(d), at 546-47 (2d ed. 1999); 3 C. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 3D § 553, at 466-70 (2004); 11 C. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2806, at 63-78 (1995). "With respect to sufficiency of the evidence, 'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Thompkins*, 678 N.E.2d at 546 (quotation and citations omitted). "Sufficiency is a test of adequacy . . . ." 29A AM. JUR. 2D *supra* § 1430; *see also Thompkins*, 678 N.E.2d at 546. "Determining whether evidence is sufficient requires both quantitative and qualitative analysis; 'quantitatively,' evidence may fail only if it is absent, that is, only where there is none at all, while 'qualitatively,' it fails when it cannot be said reasonably that the intended inference may logically be drawn therefrom." 32A C.J.S. *Evidence* § 1303(b) (1996). Where evidence is insufficient, it is "so lacking that [the case] should not . . . even be[] *submitted* to the jury." *Tibbs*, 457 U.S. at 41-42 (citation omitted).

Thus, on a motion for JNOV, where the trial court applies the sufficiency standard, *O'Neill*, 134 N.H. at 185, the trial court "uphold[s] the jury's verdict unless no rational trier of fact could find guilt beyond a reasonable doubt, considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State." *State v. Gordon*, 147 N.H. 576, 579 (2002) (quotation and citation omitted). In considering a motion for JNOV, "the [trial] court cannot weigh the evidence or inquire into the credibility of the witnesses, and if the evidence adduced at trial is conflicting, or if several reasonable inferences may be drawn, the motion should be denied." *Slattery v. Norwood Realty*, 145 N.H. 447, 448-49 (2000) (quotation and citation omitted). Because the Due

Process Clause prevents convictions based upon legally insufficient evidence, *Tibbs*, 457 U.S. at 45, the question of whether a JNOV is required because of insufficient evidence is a question of law. *O'Neill*, 134 N.H. at 184. Therefore, the trial court has little discretion when deciding whether to grant a motion for JNOV, *O'Neill*, 134 N.H. at 185, and, on appeal, we objectively review the record to determine whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Kierstead*, 118 N.H. at 496. "[W]e will reinstate the jury's verdict unless no rational trier of fact could find guilt beyond a reasonable doubt, considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State." *O'Neill*, 134 N.H. at 185 (citations omitted). Where the evidence is insufficient to support a defendant's conviction, the Double Jeopardy Clauses of the State and Federal Constitution prohibit a new trial, *State v. Sweeney*, 151 N.H. 666, 673 (2005); *Tibbs*, 457 U.S. at 41, because, "if the evidence was insufficient, the trial [court] should not have submitted the cause to the jury for its consideration, and, even on an improper submission, the jury should have acquitted," 21 AM. JUR. 2D *Criminal Law* § 414 (1998).

■ In applying the facts to the sufficiency standard, "[o]ur review does not involve an inquiry solely into whether the jury was given an instruction that guilt must be found 'beyond a reasonable doubt,' and then a search for *any* evidence of guilt." *O'Neill*, 134 N.H. at 185 (citation omitted). Rather, "[t]he search for sufficient evidence involves an evaluation of the evidence to determine whether a 'reasonable' jury could have found guilt beyond a reasonable doubt." *Id.* "Where, as here, 'the victim's testimony suffices to establish a *prima facie* case, no corroborating evidence is needed.'" *State v. Graham*, 142 N.H. 357, 360 (1997) (quoting *O'Neill*, 134 N.H. At 185); *see also* 29A AM. JUR. 2D *supra* § 1480. Further, "[b]ecause this case does not rely solely upon circumstantial evidence, the evidence need not exclude all rational conclusions except guilt. The defendant bears the burden of demonstrating that the evidence was insufficient to prove guilt." *Id.* (quotation and citations omitted).

■ Here, James' eyewitness testimony established a *prima facie* case of robbery against the defendant. James encountered the defendant not once, but twice on the night of the incident. On two separate occasions, he identified the defendant as the person who robbed him. When presented with a sixteen-person photographic array, James immediately recognized the defendant as the robber, and was "100 percent sure" of his identification. During trial, James again identified the defendant as the robber with "100 percent" certainty. In these circumstances, the jury

reasonably could have credited James' identifications and found that the defendant committed the crime. Any discrepancies between James' description of the defendant to Officer Tuttle and his later identifications presented questions of credibility and the weight to be given to James' testimony and were issues for the jury to resolve. *See Slattery*, 145 N.H. at 448-49; 29A AM. JUR. 2D *supra* § 1480. Contrary to the trial court's ruling, a rational juror could have found beyond a reasonable doubt that the defendant robbed James, and, therefore, the identification evidence was sufficient to support the guilty verdict.

 Although a verdict may be supported by sufficient evidence, a trial "court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins*, 678 N.E.2d at 546 (citation omitted); *see also United States v. Walker*, 393 F.3d 842, 847 (8th Cir. 2005). "The weight of the evidence ... is a somewhat more subjective concept than that of sufficiency. The weight given to any evidence depends upon the particular circumstances and is generally not relevant to the question of sufficiency." 29A AM. JUR. 2D *supra* § 1430. "The weight of the evidence is its weight in probative value, not the quantity or amount of evidence. It is not determined by mathematics, but depends on its effect in inducing belief." *Id.*; *see* 32A C.J.S. *supra* § 1303(a). It is basically "a determination of the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other." 29A AM. JUR. 2D *supra* § 1430. Thus, in contrast to sufficiency where we determine whether a rational *juror* could have found guilt, *State v. Pepin*, 156 N.H. 269, 281 (2007), a verdict conclusively against the weight of the evidence is "one no reasonable *jury* could return," *Mullin v. Joy*, 145 N.H. 96, 96 (2000) (emphasis added). This distinction is important because sufficiency is a question of "whether the state has met its burden of production at trial," while weight is a question of "whether the state has appropriately carried its burden of persuasion." *Thompkins*, 678 N.E.2d at 549 (Cook, J., concurring).

 A trial court's grant of a new trial on the ground that the guilty verdict is against the weight of the evidence, "unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the [trial] court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Tibbs*, 457 U.S. at 42. The trial court's "difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves." *Id.* Thus, a motion addressed to the weight of the evidence primarily presents a question of fact for the trial court, and the trial court has much more discretion when considering such a motion. *Kierstead*, 118 N.H. at 496; *see also Walker*, 393 F.3d at 847-48.

466

However, "the jury verdict must be an unreasonable one before the [trial court] may set it aside." *Panas v. Harakis & K-Mart Corp.*, 129 N.H. 591, 603 (1987) (citation omitted). Thus, the trial court should exercise its discretion with caution and invoke its power to grant a new trial "only in exceptional cases in which the evidence preponderates heavily against the verdict" and "where a miscarriage of justice may have resulted." 3 WRIGHT, *supra* § 553; *see also* 5 LAFAVE, *supra* § 24(d), at 547. The trial court should not disturb the jury's findings unless the jury clearly failed to give the evidence its proper weight. 29A AM. JUR. 2D, *supra* § 1431.

Because the trial court has greater discretion when ruling upon a motion to set aside the verdict as against the weight of the evidence, our scope of review of such a decision is narrower. *Kierstead*, 118 N.H. at 496; *see also O'Neill*, 134 N.H. at 184; *Walker*, 393 F.3d at 847-48. We will uphold the trial court's decision unless it was made without evidence or constituted an unsustainable exercise of discretion. *Kierstead*, 118 N.H. at 496-97; *O'Neill*, 134 N.H. at 184 (holding that standard of review laid out in *Kierstead* for civil cases applies to criminal cases). We "defer to the better opportunity the trial judge ha[d] to appraise the situation." 11 WRIGHT, *supra* § 2819. After all, the trial judge "conducts the trial, observes the witnesses and the jury, and is in a better position than we are to evaluate the whole atmosphere of a trial, much of which cannot be gleaned from that portion of the proceedings that is reducible to a cold record." *Kierstead*, 118 N.H. at 497. "Whether we, sitting as trial judges, would have reached the same or a different result is immaterial. In the doubtful case[s] . . . we should defer to [the trial court's] judgment." *Id.*

The degree of deference to the trial court, however, depends upon whether the trial court granted or denied a motion to set aside the verdict as against the weight of the evidence. When a trial court grants such a motion, "there is [a] usurpation by the court of the prime function of the jury as the trier of facts." *Lind v. Schenley Industries Inc.*, 278 F.2d 79, 90 (3d Cir. 1960); *see also United States v. Pedrick*, 181 F.3d 1264, 1267 (11th Cir. 1999); *Borras v. Sea-Land Service, Inc.*, 586 F.2d 881, 887 (1st Cir. 1978); 11 WRIGHT, *supra* § 2819. Therefore, "[w]here a court's decision is based on the weight of the evidence . . . the decision to grant a motion for new trial will be more closely scrutinized than the denial of such a motion. This more stringent standard of review is to ensure that proper deference is given to a jury's factual determinations." *Pedrick*, 181 F.3d at 1267 (quotation and citation omitted); *see also Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 178-79 (1st Cir. 1988); *cf. Taylor v. Washington Terminal Co.*, 409 F.2d 145, 148 (D.C. Cir. 1968). When we reverse the trial court's grant of a new trial, we do not reexamine the facts found by the jury, but

rather, reinstate the jury's findings as against the contrary findings of the trial court. 11 WRIGHT, *supra* § 2819. In this context, our "action protects the role of the jury, . . . rather than running contrary to it." *Id.* Notably, "[a] reversal based on the weight of the evidence . . . can occur only after the State both has presented sufficient evidence to support conviction and has persuaded the jury to convict." *Tibbs*, 457 U.S. at 42-43. Thus, the Double Jeopardy Clause does not preclude retrial of a defendant if the reversal is based upon a finding that the conviction was against the weight of the evidence. *Id.* at 47.

After reviewing the evidence in the record in conjunction with the trial court's decision, we conclude that the trial court unsustainably exercised its discretion to the extent it found that the jury's verdict was against the weight of the evidence. The record does not establish an objective basis sufficient to sustain the trial court's conclusion that James' description of the perpetrator to Officer Tuttle "simply varie[d] too greatly from [the defendant]'s actual physical attributes" such that the actual perpetrator was Daniels and not the defendant. *See Lambert*, 147 N.H. at 296. In reaching this conclusion, the trial court relied upon two apparent discrepancies between James' initial description to Officer Tuttle and his later identification of the defendant as the perpetrator: height and facial hair. In finding that the verdict was contrary to the evidence as a result of these differences, however, the trial court gave undue weight to them. *Cf. United States v. Campos*, 306 F.3d 577, 580 (8th Cir. 2002).

While James estimated the perpetrator's height as being considerably less than the defendant's actual height when reporting to Officer Tuttle, James also significantly underestimated the defendant's height during trial. Thus, the trial court gave undue weight to the differences between James' description of the perpetrator's height to Officer Tuttle and the defendant's actual height. The trial court also gave undue weight to James' inability to recall that the perpetrator had facial hair when he spoke with Officer Tuttle. While the defendant testified that he had worn the goatee for eight straight years, no evidence corroborated his claim that he had in fact been wearing the goatee since he was thirteen years of age. Indeed, the trial court's explicit finding that another witness corroborated the defendant's testimony "that he had worn a goatee for many years" was clearly erroneous. Our review of the record reveals no such testimony. Moreover, in weighing these purported discrepancies, the trial court did not accord sufficient weight to the fact that James twice identified the defendant as the perpetrator with "100 percent" certainty. Finally, the trial court failed to consider that, although his apparent theory of the case was that no robbery had occurred, the defendant presented no evidence suggesting that James had a motive to fabricate the robbery.

 Given James' two positive identifications of the defendant, we conclude that the trial court gave undue weight to the discrepancies upon which it relied, and that it unsustainably exercised its discretion in granting a new trial. This is not one of those exceptional cases where the jury failed to give the evidence its proper weight. Rather, this was a classic jury case, in which the jury examined and properly weighed the conflicting evidence to conclude that the defendant committed the robbery. *See Taggart v. State*, 957 So. 2d 981, 987 (Miss. 2007). Accordingly, we reinstate the jury's verdict and remand for sentencing.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.