Strafford
No. 2011-230

THE STATE OF NEW HAMPSHIRE

v.

DIANNA SAUNDERS

Argued: September 12, 2012
Opinion Issued: November 9, 2012

344

*Michael A. Delaney*, attorney general (*Michael S. Lewis*, assistant attorney general, on the brief and orally), for the State.

*Robert L. Sheketoff*, of Boston, Massachusetts, on the brief and orally, and *Jeffrey Karp*, of Newburyport, Massachusetts, on the brief, for the defendant.

LYNN, J. Following a jury trial in Superior Court (*Wageling*, J.), the defendant, Dianna Saunders, appeals her convictions for being an accomplice to first degree murder, RSA 626:8, III(a) (2007); RSA 630:1-a, I(a) (2007), conspiracy to commit murder, RSA 629:3 (2007); RSA 630:1-a, I(a), theft by unauthorized taking, RSA 637:3 (2007); RSA 637:11, I(a) (2007), and theft by misapplication of property, RSA 637:10 (2007); RSA 637:11, I(a). On appeal, she argues that the trial court erred when it: (1) instructed the jury that, where a case involves both direct and circumstantial evidence, the evidence does *not* have to exclude all rational conclusions other than the defendant's guilt; (2) found that the defendant consented to a general rather than a limited search of her home; and (3) did not address the constitutionality of the warrant to search the home. We affirm.

I

On August 29, 2008, a woman who identified herself as "Dianna" called Dover Emergency Dispatch and reported an unconscious male, not breathing, in the basement of 81 Old Dover Point Road in Dover. Dispatched paramedics found the defendant's boyfriend, David King, dead in the home that he and the defendant shared. King had died of a gunshot to the head. He also had shallow cuts on his body and a deep cut on his neck.

Dale McLaskey, whose backyard abutted the defendant's and King's property, saw King working in his yard on the afternoon of August 29. Around 5:30 p.m. King borrowed McLaskey's garden hose and then went back to his house. That evening, between 5:30 and 7:30 p.m., McLaskey saw two men walking through King's yard and into the woods. He recognized the men as Scott Mazzone and Derek Saunders (Derek), the son of the defendant's ex-husband, Roy Saunders (Roy).

Another neighbor saw an unfamiliar green Jeep Grand Cherokee with Massachusetts license plates parked off Old Dover Point Road on August 28 and heading down Old Dover Point Road around 6:30 p.m. on August 29. A third neighbor reported seeing a green Jeep Cherokee parked off Old Dover Point Road around 6:30 p.m. on August 29. Police later determined that Mazzone owned a green Jeep Grand Cherokee with Massachusetts plates.

On August 31, Sergeant William Breault of the Dover Police Department interviewed Derek. Derek implicated his father as well as Mazzone and the defendant in a conspiracy to murder King. He subsequently pleaded guilty to being an accomplice to second-degree murder and agreed to testify at the defendant's trial. He testified to the following.

Around January 2008, Roy told Derek that the defendant had given him $8,000 to have King killed because King was abusive. Derek then spoke with his friend, Mazzone, who owned three guns. Derek also spoke with the defendant, who told him that she needed his help and wanted King gone because they were having problems. The defendant reminded Derek that Roy still had the money.

At that time, the defendant and King were planning to move to Texas. Neither Derek nor Roy wanted her to move. The defendant told Derek that, if the plan to kill King went through, she would go to Texas for only a few months and then return to New Hampshire. According to Derek, he and the defendant discussed the plan no more than six times. At some point, Roy returned the money to the defendant, and told Derek that he and the defendant "didn't think it was going to be done." Discussions about the plan continued, however. Eventually, Roy received the money back from the defendant. About a month before putting the plan into action, Derek and Mazzone decided that, using one of Mazzone's guns, they would shoot King in the basement of his house so as to muffle the sound of the gunshot.

Rose England, the mother of King's three children, testified that around the same time, in late July or early August 2008, King told her that the defendant had talked a doctor into taking out a home equity loan, and that she was using the money for living expenses and to pay her mortgage in Dover as well as to buy a house in Texas. King told England that he was going to report the defendant to "the authorities."

A doctor named William Meredith testified that in the summer of 2006, the defendant helped him sell his property in Concord. Around the same time, Meredith took out a reverse mortgage on a house he owned in Cape Neddick, Maine. After his wife died in the summer of 2006, Meredith started seeing the defendant and King socially, and King did maintenance work on the Cape Neddick property. Eventually, the defendant asked Meredith to increase the reverse mortgage and lend her the money. She

told Meredith that she needed the money to renovate a property in Dover for which she had a ready buyer. The buyer would reimburse her for the renovations — and she would reimburse Meredith — when the property sold in August 2008.

The bank increased Meredith's reverse mortgage and, in October 2007, wired over $440,000 into a joint checking account on which Meredith and the defendant were the only named signatories. Two or three months later, Meredith attempted to withdraw money and discovered that the funds had been withdrawn six or seven weeks after they had been deposited. Meredith went to the police on August 19, 2008, and explained that he had authorized the defendant to use only $220,000 of the funds in the account.

Nine days later, on the evening of August 28, Derek and Mazzone met with the defendant to make sure that she still wanted to have King killed. Derek and Mazzone drove to her house in Mazzone's green Jeep Cherokee. The defendant confirmed that she still wanted King killed and suggested five o'clock the next day, when she would absent herself from the house. The defendant told Derek that she would call Roy and let him know the time, and that Roy would call Derek and tell him when to come to the house.

On August 29, 2008, Derek spoke with Roy, who confirmed that King was alone in the house and that "everything was all set to go." On the way to the defendant's and King's house, Derek called the defendant to make sure that she was out of the house and that "everything was still a go." The defendant said that she and a friend were renting a movie and shopping for food.

When they arrived in Dover, Derek and Mazzone parked off Old Dover Point Road and entered the house through an open rear sliding door. They went downstairs to the basement. Mazzone shot King and then stabbed him in the neck. Derek and Mazzone left the house and headed to the woods. On the way, Derek noticed a neighbor sitting in a lawn chair. After returning to the Jeep, Derek called the defendant and told her not to return home until he and Mazzone left New Hampshire.

The defendant called 911 around 7:12 p.m. Paramedics were the first to arrive, followed by Dover Police Officer Daniel Gebers. Inside the basement, he found the defendant, with whom he was acquainted. The defendant told Gebers that she had gone to the store, come home, and found King in the basement. Gebers escorted her to his police cruiser. She sat in the front passenger seat and was not handcuffed.

Shortly thereafter, Dover Police Detective Janine Harrington arrived. Detective Harrington explained the investigation process to the defendant and asked for her permission to search the home and vehicles. The defendant agreed verbally and in writing. Dover police also obtained and executed a warrant to search the defendant's home.

In September 2008, the defendant moved to Texas, where she lived until she was arrested in July 2009. Following trial, she was convicted of the four charges on which she was indicted: accomplice to first degree murder, conspiracy, theft by unauthorized taking, and theft by misapplication of property. This appeal followed.

## II

The defendant first argues that the jury instructions given by the trial court violated her rights to due process under the State and Federal Constitutions. "Due process requires that the State prove each element of the crime charged beyond a reasonable doubt." *State v. Parker*, 142 N.H. 319, 322 (1997); *In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). We first address the defendant's claim under the State Constitution and rely upon federal law only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

The trial court instructed the jury as follows:

> There are two types of evidence, direct and circumstantial evidence. Direct evidence is the testimony of a person who claims to have personal knowledge of facts about the crime charged, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances which tend to show whether the defendant is guilty of [*sic*] not guilty.

> There is no distinction between the weight to be given either direct or circumstantial evidence. Both types of evidence are equally acceptable and may be sufficient to establish the elements of a crime beyond a reasonable doubt.

> Whether you are considering direct or circumstantial evidence, you may draw reasonable inferences [from] facts proved and from facts found as a result of reasonable inferences.

> *In a case where both direct and circumstantial evidence is offered for a conviction, the evidence does not have to exclude all rational conclusions other than the defendant's guilt.*

When the defendant objected to the portion of the instruction emphasized above, the trial judge stated: "The circumstantial evidence instruction that I provided is based on specific case law in New Hampshire. . . . [B]ecause

this case lends itself . . . to a finding that there was direct and circumstantial evidence, I believe that my instruction is appropriate in New Hampshire."

The defendant argues that by instructing the jury that the evidence does *not* have to exclude all rational conclusions other than guilt, the trial court in effect instructed the jurors to convict her even if they still harbored a rational conclusion that she was not guilty. This, the defendant argues, impermissibly lowered the State's burden of proof to something less than "beyond a reasonable doubt."

■■ "[T]he purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." *State v. McDonald*, 163 N.H. 115, 126 (2011) (quotation omitted).

> When reviewing jury instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case. We determine whether the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case. Whether a particular jury instruction is necessary, and the scope and wording of jury instructions, are within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion.

*State v. Davidson*, 163 N.H. 462, 472 (2012) (quotations and citations omitted).

■■ We conclude that the trial court erred as a matter of law when it instructed the jury that, "[i]n a case where both direct and circumstantial evidence is offered for a conviction, the evidence does not have to exclude all rational conclusions other than the defendant's guilt." The trial court's error in this regard serves to demonstrate an important point: statements of the law contained within our decisions cannot simply be incorporated into jury instructions; rather, consideration must be given to the context in which the statements were made and whether that same context appropriately "fits" the task assigned to the jury. As explained below, in this case no such fit existed.

■ The challenged instruction was apparently taken from our decisions in *State v. Graham*, 142 N.H. 357 (1997), and *State v. Spinale*, 156 N.H. 456 (2007). In both cases, in addressing challenges to the sufficiency of the evidence, we observed that, in a "case [which] does not rely solely upon circumstantial evidence, the evidence need not exclude all rational conclusions except guilt." *Graham*, 142 N.H. at 360 (quotation omitted); *Spinale*,

156 N.H. at 464 (quotation omitted). While this statement is an accurate recitation of the law in the context of our standard of review for addressing sufficiency of the evidence claims, it is completely out of place as an instruction to the jury designed to elucidate the State's burden of proof in a criminal trial.

When considering a challenge to the sufficiency of the evidence, "we objectively review the record to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State." *Spinale*, 156 N.H. at 464 (quotations and citation omitted). It is "[t]he defendant [who] bears the burden of demonstrating that the evidence was insufficient to prove guilt." *Id.* (quotation omitted); *Graham*, 142 N.H. at 360. The reason a sufficiency analysis need not exclude all rational conclusions other than guilt in a case that does not rely solely on circumstantial evidence is because of the jury's role in making credibility determinations. That is, where the proof involves both direct and circumstantial evidence, a sufficiency challenge must fail if the evidence, including the jury's credibility determinations, is such that a rational trier of fact could find guilt beyond a reasonable doubt, even if the evidence would support a rational conclusion other than guilt if the jury had resolved credibility issues differently. On the other hand, where solely circumstantial evidence is at issue, the critical question is whether, even assuming all credibility resolutions in favor of the State, the inferential chain of circumstances is of sufficient strength that guilt is the sole rational conclusion.[1] *See State v*

---

[1] In a challenge to the sufficiency of evidence, where both direct and circumstantial evidence are involved, we must consider, as part of the evidence, the jury's credibility determinations because such determinations are part and parcel of direct evidence. By contrast, a sufficiency challenge based solely on circumstantial evidence comes down to whether the sole rational conclusion is one of guilt. In *People v. Kennedy*, 391 N.E.2d 288 (N.Y. 1979), the court considered whether the evidence sufficiently supported the defendant's conviction and, in deciding that it did, the court discussed the entanglements in logic and reason that circumstantial evidence may create for criminal trial juries:

> [C]ases involving circumstantial evidence must be closely reviewed because they often require the jury to undertake a more complex and problematical reasoning process than do cases based on direct evidence. In the latter situation, the jury is normally concerned primarily with assessing the credibility of witnesses, a role for which the jury is superbly suited. *Where, however, the defendant's guilt is to be proven, if at all, by circumstantial evidence only, the jury must attempt a careful and close analysis of the evidence and determine what inferences can and should be drawn not merely from each separate piece of evidence, but from the whole complex of interrelated information which is presented in evidence. This is not to suggest, of course, that a jury need not carefully analyze the evidence in a case based on direct evidence. However, in such a case, the jury has less need to depend on inference, and is more likely to be faced with the relatively less complex,*

*Bird,* 122 N.H. 10, 17 (1982) ("It is well established in this State that circumstantial evidence may be sufficient to support a conviction if it excludes all other rational conclusions."); *accord State v. McCue,* 134 N.H.. 94, 104 (1991).

 Our deferential standard of review, which *assumes* the jury made all factual findings and credibility determinations necessary to support its verdict, is wholly inapposite to the burden of proof that the jury must *actually apply* in reaching a verdict. The pertinent legal propositions as to which the jury must be instructed in a criminal case include the presumption that the defendant is innocent and the requirement that the State bear the burden of proving each element of the charged offense beyond a reasonable doubt. *State v. Wentworth,* 118 N.H. 832, 838-39 (1978). Injecting the challenged language into an instruction on the burden of proof risks confusing the jury and diluting the State's burden because it suggests that a conviction may be warranted notwithstanding the jury's determination that there is a rational conclusion the defendant is innocent. Therefore, in a criminal case that includes direct evidence, trial courts should not include in instructions to the jury language indicating that the evidence need not exclude all rational conclusions other than guilt.[2]

 Although we agree with the defendant that the challenged instruction risks confusing the jury, we disagree that this risk automatically amounts to a violation of her right to due process. "In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146-47 (1973), *adopted in State v. Belkner,* 117 N.H. 462, 471 (1977). "[T]he question is not whether the trial court failed to isolate and cure a particular

*although no less difficult task of determining which witnesses are telling the truth.* In a circumstantial evidence case, in contradistinction, the reasoning process tends to be more complex, and is thus more subject to error. Hence, close judicial supervision is necessary to ensure that the jury does not make inferences which are based not on the evidence presented, but rather on unsupported assumptions drawn from evidence equivocal at best. Careful review of such cases is needed to decrease a danger legitimately associated with circumstantial evidence — that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree.

*Kennedy,* 391 N.E.2d at 290-291 (citations and quotation omitted); *see also Commonwealth v. Webster,* 59 Mass. 295, 312 (5 Cush.) (1850), *overruled on other grounds by Commonwealth v. McLeod,* 326 N.E.2d 905, 906 (Mass. 1975).

[2] Of course, in a case where the evidence regarding one or more elements of a crime is solely circumstantial, trial courts should continue to instruct the jury that circumstantial evidence must be sufficient to exclude all rational conclusions other than guilt.

ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147. "The constitutional question . . . is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).

▉ The trial court read verbatim to the jury the model instruction on the State's burden of proof that we announced in *Wentworth*, 118 N.H. at 838-39. Over the course of the proceedings, the jury heard the correct instruction on the State's burden of proof beyond a reasonable doubt approximately twenty times. There is no reasonable likelihood that the jury understood the challenged instruction as allowing it to convict the defendant based on proof less than "beyond a reasonable doubt." *Victor*, 511 U.S. at 5. We conclude that "the ailing instruction by itself [did not] so infect[] the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147.

▉ As both the State and Federal Constitutions require the State to prove each element of the crime charged beyond a reasonable doubt, the State Constitution is at least as protective of the defendant's rights as the Federal Constitution in the context of a due process challenge to jury instructions. *State v. Hall*, 148 N.H. 394, 398 (2002). Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution. *Id.*

### III

Next, the defendant argues that the trial court should have suppressed the evidence that the police gathered when they searched her home.[3] *See* N.H. CONST. pt. I, art. 19; U.S. CONST. amend. IV. "Our review of the superior court's order on a motion to suppress is *de novo*, except as to any controlling facts determined by the superior court." *State v. Denoncourt*, 149 N.H. 308, 309 (2003). Again, we first address the defendant's claim under the New Hampshire Constitution, citing federal cases only to aid in our analysis. *See Ball*, 124 N.H. at 232.

▉ Part I, Article 19 of the New Hampshire Constitution protects against unreasonable searches and seizures. "Under Part I, Article 19, . . . warrantless searches are *per se* unreasonable unless they fall within the

---

[3] The only specification of the fruits of the search which the defendant claims should have been suppressed is found in footnote 13 of her brief, wherein she lists "the cordless phone, desk drawer contents, the contents of the plastic bin in the living room, and the contents of the defendant's purse," as evidence admitted at trial.

narrow confines of a judicially crafted exception." *State v. LaBarre*, 160 N.H. 1, 7 (2010) (quotation omitted). "One such exception exists where the officer has consent to . . . search the [property]." *State v. Coyman*, 130 N.H. 815, 818 (1988) (quotation omitted).

> When the police are relying upon consent as a basis for their warrantless search, they have no more authority than they have been given by the consent. The question of the scope of consent may be stated as how far the defendant intended the consent to extend or how the police reasonably construed his consent.

*State v. Pinder*, 126 N.H. 220, 224 (1985) (quotations and citations omitted). "To determine whether a search has exceeded the scope of the permission granted, we ask whether under the circumstances surrounding the search, it was objectively reasonable for the officers conducting the search to believe that the defendant had consented to it." *State v. Livingston*, 153 N.H. 399, 408 (2006).

The defendant argues that the only objectively reasonable interpretation of her exchange with Detective Harrington is that she consented to having her property documented as a crime scene rather than searched. We disagree.

The trial court found that the defendant consented to a general search of her home rather than a search limited to photographing and documenting the scene.

> [The defendant] asserts that Det. Harrington told her that the police would only be searching to determine if other individuals were present at the home and taking photographs of the scene.
>
> Contrary to Defendant's contentions, the court finds that Det. Harrington told Defendant that they were going to search the premises to check for other people in the home or vehicles and take pictures of the scene. She also explained to Defendant that the police would be looking for anything that would explain what happened to King and why. In fact, many hours after Defendant signed the release, she was told that she could not return to her home, as the investigation/search was ongoing. Det. Harrington showed Defendant the consent to search form, read it aloud, and explained its meaning. Defendant verbally indicated that she understood it [and] granted the police permission to search her house and vehicles, and then signed the form. The exchange between Defendant and the police was calm and polite. The consent form does not limit the scope of the search of Defendant's

> home or the vehicles found within the premises, nor is there any credible evidence before the court that Defendant was [led] to believe that she was granting a limited search by signing the consent form. . . . Based on the totality of the circumstances, the court finds that Defendant's consent allowing the police to fully search her home and the vehicles located on the premises was free, knowing and voluntary.

These findings are supported by the record.

Detective Harrington testified that she first saw the defendant in the front passenger seat of Officer Gebers's car. Upon introducing herself, she explained the investigation process to the defendant. She told the defendant that the police "would have to investigate what happened, . . . would have to go into the house, try to see what happened inside the house, try to document everything, take photos and whatnot." The defendant appeared to understand what Detective Harrington was saying and verbally indicated to Detective Harrington that she did. Detective Harrington then asked the defendant "if she would voluntarily give [the police] consent to go into the residence, as well as to go into the vehicles that were on the property." She explained to the defendant that the police needed to search the vehicles because "[they] were just looking for anything that could help."

█ In arguing that her verbal consent was limited, the defendant relies upon the following testimony, which Detective Harrington gave on direct examination: "I said we would have to go into the house, look around, . . . take photos, try to determine what happened, and she said that was fine. She said it was okay." On cross-examination, Detective Harrington testified that "[the defendant] said it would be okay to go into the house. She verbally said it was okay for officers to go in there to take photographs." Even assuming that the defendant's initial verbal consent could be construed as limited, the evidence demonstrated that she subsequently gave written consent for a general search of the house and the vehicles on the premises.

Detective Harrington testified that, upon obtaining the defendant's verbal consent, she took out a consent-to-search form, explained what it meant, read it to the defendant word for word, and filled it out. The defendant indicated that she understood the form. Detective Harrington then asked the defendant to read the form and, if she did not have any questions, to sign it. The defendant signed the consent-to-search form, which states,

> I, Dianna Saunders, 10/24/08, hereby authorize the Dover Police Department to conduct a search of my . . . vehicle/premises . . . located at:

81 Old Dover Point Rd. in Dover . . . .

I understand that I do not have to consent to this search.

I understand that I may revoke my consent at any time during the search.

This written permission is being given freely and voluntarily without threats or promises of any kind.

Neither when she signed the form nor in the next six or seven hours, when the search was ongoing and the defendant was with Detective Harrington, did she revoke the consent to search the residence and vehicles.

Insofar as the trial court relied on Detective Harrington's testimony in finding that the defendant consented to a general search of her home and vehicles, "we defer to the trial court's determination of credibility. Because a reasonable person could have come to the same conclusion as did the trial court after weighing the testimony, we will not disturb the trial court's finding that the defendant did not limit the scope of the search . . . ." *Livingston*, 153 N.H. at 408 (citation omitted).

Although the defendant argued to the trial court that her consent was not voluntary, she did not brief this issue, thus waiving it. *State v. Kelley*, 159 N.H. 449, 455 (2009). Having found that the defendant consented to a general search of her home, we do not need to address her third argument, that the search warrant was unconstitutionally overbroad and lacked specificity.

 Because the State Constitution provides at least as much protection as the Federal Constitution with respect to the scope of a consent search, *see Livingston*, 153 N.H. at 408-09; *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), we reach the same result under the Federal Constitution as we do under the State Constitution.

We also deem waived the remaining questions that the defendant raised in her notice of appeal but did not brief. *Kelley*, 159 N.H. at 455.

*Affirmed.*

DALIANIS, C.J., and HICKS, CONBOY and BASSETT, JJ., concurred.