Rockingham
No. 2010-383

THE STATE OF NEW HAMPSHIRE

v.

JOHN STOWE

Submitted: June 16, 2011
Opinion Issued: September 22, 2011

*Michael A. Delaney*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief), for the State.

*Dorothy E. Graham*, assistant appellate defender, of Concord, on the brief, for the defendant.

LYNN, J. The defendant, John Stowe, appeals his convictions of false report to law enforcement, RSA 641:4, and of unsworn falsification, RSA 641:3, arguing that the Superior Court (*McHugh, J.*) erred when it: (1) limited his cross-examination of a crucial State witness; (2) denied his request for a curative instruction on the State's misstatements of law made during closing argument; and (3) denied his motion to dismiss the unsworn falsification complaint. We affirm the false report conviction and reverse the unsworn falsification conviction.

We recite the facts drawn from the record. In 2005, John Deere Company was authorized to repossess a tractor that the defendant had financed through it. John Deere was unsuccessful in doing so, however, because the tractor was not at the expected location. The defendant claimed that he did not know what happened to the tractor. During a subsequent court hearing, the trial court ordered the defendant to file a police report indicating that the tractor had been stolen.

In February 2006, the defendant told a Derry police officer that he had left the tractor on his lawn in the spring or summer of 2005 for John Deere to take possession of it, went on a business trip, and discovered it was gone when he returned home. He told the officer that he had assumed that John Deere repossessed it. The defendant completed a written statement, and the officer explained that a false report would result in "consequences." The form itself contained the following notification: "I understand that false written statements made herein are punishable pursuant to RSA 641:3, unsworn falsification."

During the time frame relevant to this case, the defendant worked for Frederick Nixon, who owned a demolition company. The defendant and Nixon had developed a close friendship, and socialized frequently. On September 6, 2006, Brian Dunn, also an employee of Nixon, contacted the police regarding suspicions he had about a tractor he had transported to one of Nixon's work sites. Dunn informed the police of the tractor's location and provided a photograph of it. The police obtained a search warrant but discovered that the tractor was no longer there. They left a copy of the

warrant at the work site. About a week later, the tractor was located in some woods behind a towing yard in Derry. The police matched the tractor's VIN numbers with that of the tractor that the defendant had reported as stolen.

In January 2007, the investigating officer briefly spoke with Nixon, then interviewed him in March of that year. Subsequently, the defendant was charged with one count of giving a false report to law enforcement and one count of unsworn falsification. At trial, he unsuccessfully moved to dismiss the unsworn falsification charge. The jury found him guilty on both counts. This appeal followed.

## I

The defendant first argues that the trial court erred in limiting his cross-examination of Nixon, thereby violating his rights to confrontation under Part I, Article 15 of the State Constitution and the Sixth and Fourteenth Amendments of the Federal Constitution. He sought to cross-examine Nixon about events that purportedly demonstrated Nixon's bias and hostility towards him, and about an alleged prior false statement Nixon had made to the police. We conclude that the defendant has failed to establish error.

We first consider the defendant's constitutional arguments under the State Constitution, referring to federal decisions only for guidance. *See State v. Ball*, 124 N.H. 226, 231-33 (1983). "The opportunity to impeach a witness's credibility through cross-examination is an incident of rights guaranteed by part I, article 15 of the State Constitution." *State v. Brum*, 155 N.H. 408, 416 (2007) (quotation omitted); *see State v. Etienne*, 146 N.H. 115, 117 (2001) (right to cross-examine adverse witnesses in criminal cases is fundamental). Cross-examination provides the defendant a right to meet the witnesses against him face to face, and be fully heard in his defense. N.H. CONST. pt. I, art. 15; *Etienne*, 146 N.H. at 118. This includes the right to expose the possible biases of witnesses. *Etienne*, 146 N.H. at 118.

The trial court has "broad discretion to fix the limits of proper areas of cross-examination, including attacks upon a witness's credibility." *Brum*, 155 N.H. at 416. The trial court, however, "may not completely deny a defendant the right to cross-examine a witness upon a proper matter of inquiry and must permit sufficient cross-examination to satisfy a constitutional threshold." *Id.* "Once a defendant has been permitted a threshold level of inquiry the constitutional standard is satisfied, and the [trial court's] limitation of cross-examination thereafter is measured against an unsustainable exercise of discretion standard." *Id.* (quotation and ellipsis omitted). "Thus, when the record reveals that a threshold level of inquiry

was allowed, we will uphold the trial court's decision limiting the scope of further cross-examination unless the defendant demonstrates that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Id.* (quotation omitted).

There is no doubt that Nixon was a key State witness. He testified that the defendant had allowed him to use the tractor for several projects during 2005 and 2006. He also testified that the defendant had asked him to keep it parked on the side of his house to prevent detection, explaining that he did not want his ex-wife to learn about the tractor. According to Nixon, some time in 2006, the defendant asked him to change the tractor's location so his ex-wife could not discover it. Nixon complied, moving it to a friend's home. At some point, the tractor was repaired at Nixon's workplace and then moved to a work site in North Conway where the defendant was managing a job.

Nixon testified that after the police attempted to seize the tractor in September 2006, he was "horrified" that police officers had been searching one of his company's job sites. He contacted the defendant, who told him that the court had required him to report it as stolen. Nixon explained that the defendant discouraged him from calling the police by telling him that he might be charged with grand larceny. Nixon did not contact the police, but moved the tractor to yet another location and then told the defendant, "I'm all done with this." The defendant had some friends again move the tractor, and the police later seized it. In March 2007, Nixon informed the police of the defendant's involvement with the tractor.

Testifying on his own behalf, the defendant maintained that he had parked the tractor on his lawn in the spring or summer of 2005 and had not seen it since. He assumed that John Deere had retrieved it while he was away from his home, and also posited that Nixon or two of his other friends may have taken it because all three had asked to borrow it. He denied Nixon's account of the defendant's involvement with the tractor throughout 2005-2006.

To establish Nixon's bias against him and motive to lie to the police, the defendant sought to cross-examine him about events that occurred around the time Nixon gave his statement to the police, including a physical confrontation between them, criminal threatening complaints the defendant had filed against Nixon, and the fact that the defendant had testified at Nixon's divorce and custody proceeding where Nixon's income and finances were at issue. To further challenge Nixon's credibility, the defendant sought to elicit testimony that Nixon had lied to a police officer during the investigation of a criminal threatening complaint against him. The State objected, arguing that the defendant had an adequate opportunity to cross-examine Nixon on his credibility by questioning him at length

about inconsistent statements he had made in prior court proceedings. It also contended that the "bad blood" between the two men was not in dispute, and testimony on specific events underlying their hostilities would be irrelevant, be a waste of time, cause confusion of the issues, and constitute "a trial within a trial." The State also argued that if the defendant elicited testimony on the specific instances of conduct, he would open the door to testimony that he had embezzled from Nixon, which was part of the basis of the hostilities.

The trial court denied the defendant's request, determining that it would not allow a "trial within a trial," and that the defendant had "adequate confrontation" regarding Nixon's bias and motive, as well as the State's presentation of his character as not "an angel." It ruled that the character of both the defendant and Nixon, including "their disdain and dislike for one another," was not disputed by the State and was "crystal clear in the jury's mind," and that the details formulating their disdain were "totally irrelevant, [would] run the risk of undue prejudice" and would distract the jury from the criminal charges before it.

We first consider whether the defendant was permitted a threshold level of inquiry regarding Nixon's bias against him and motive for casting him "as a thief and a liar." *See Brum*, 155 N.H. at 416. Clearly, Nixon's bias and motive as grounds for impeachment were relevant to the defense, but the State correctly argues that these issues were not in dispute. On direct examination, the State elicited testimony from Nixon that around the time he talked to the police about the defendant's involvement with the tractor, he had a "falling out" with the defendant. Defense counsel reiterated the point on cross-examination, eliciting testimony that when Nixon first learned the police were looking for the tractor in September 2006, he did not inform them of the defendant's involvement with the tractor for three months, but, after the relationship between the two men "[broke] down," he contacted the police. Nixon agreed on cross-examination that there was "no love lost between [the two men] at [the] point" when he contacted the police. On re-direct, the State asked several questions establishing that Nixon and the defendant had been close friends, and on re-cross, Nixon agreed that at the time he first contacted the police in January 2007, he and the defendant "despised each other" and "weren't speaking."

█ On this record, we conclude that the defendant was permitted an ample threshold level of inquiry on Nixon's bias and motive. The record supports the trial court's finding that the hostility between the men was obvious to the jury; indeed, the trial court remarked that the demeanor of the witnesses regarding their disdain for one another was apparent during their testimony. That the trial court restricted the defendant from inquiring

about the specific underlying events giving rise to the hostilities does not equate to precluding him from engaging in a threshold inquiry on the matters of bias and motive. We conclude that the trial court's decision did not "impermissibly limit the defendant's ability to effectively impeach the principal witness against him at trial in violation of Part I, Article 15 of the New Hampshire Constitution." *State v. Miller*, 155 N.H. 246, 254 (2007) (quotation omitted). The defendant makes the identical arguments under the Federal Confrontation Clause, without engaging in a separate federal analysis. *But see id.* at 255-56. Thus, we reach the same result under the Federal Constitution. We note that the defendant does not argue that the trial court's decision was clearly untenable or unreasonable to the prejudice of his case, and, thus, we do not review the trial court's ruling on that basis.

With respect to the alleged false statement Nixon made to an investigating police officer, the defendant argues that it is a specific instance of dishonesty that was admissible under New Hampshire Rule of Evidence 608(b), and that the trial court's ruling was an unsustainable exercise of discretion which denied him the opportunity to make a threshold level of inquiry to discredit Nixon, contrary to Part I, Article 15 of the New Hampshire Constitution and the Sixth and Fourteenth Amendments to the Federal Constitution. Assuming, without deciding, that his argument was preserved for appellate review, we conclude that the defendant has failed to demonstrate error.

██ Rule 608(b) permits a cross-examiner to inquire into conduct that is probative of the witness's character for truthfulness or untruthfulness. *Miller*, 155 N.H. at 249. Generally, however, the examiner must take the answer as the witness gives it. *Id.* Rule 608(b) prohibits the examiner from introducing "extrinsic evidence, such as calling other witnesses, to rebut the witness's statements." *State v. Hopkins*, 136 N.H. 272, 276 (1992). "The objective is to avoid a trial within a trial; that is, to avoid the litigation of issues that are collateral to the case at hand." *Miller*, 155 N.H. at 249.

██ When exercising its discretion under Rule 608(b), the trial court must also consider Rule 403. *Brum*, 155 N.H. at 412. "The overriding protection of Rule 403 requires that probative value not be outweighed by danger of unfair prejudice, confusion of issues, or misleading the jury." *Id.* (citing reporter's notes to Rule 608(b)) (quotation omitted). The trial court has broad discretion to determine the admissibility of evidence, and we will not upset its ruling absent an unsustainable exercise of discretion. *Miller*, 155 N.H. at 249. To prevail under this standard, the defendant must demonstrate that the trial court's decision was clearly untenable or unreasonable to the prejudice of his case. *Id.*

■ The defendant points to the following evidence he sought to use to cross-examine Nixon:

> During a prior hearing in district court, [the investigating police officer] testified that in the course of investigating Stowe's criminal threatening complaint against Nixon, Nixon denied making the threatening calls to the defendant . . . . Nixon testified at a prior hearing . . . that he did in fact tell [the officer] that he made phone calls to [the defendant], but that he did not make a criminal threat.

Essentially, the defendant wanted to question Nixon about the investigating officer's testimony at the prior court proceeding that Nixon denied making any phone calls to the defendant, and about Nixon's prior statement that he admitted to making non-threatening phone calls. However, the trial court could have found that the purported discrepancy between Nixon's initial statement to the police and his later testimony at the court proceedings was ambiguous, thereby making the probative value marginal. Moreover, the record demonstrates that the defendant was permitted to cross-examine Nixon on numerous alleged inconsistencies between his testimony at trial and statements he made under oath at a prior court proceeding and to the police. We conclude that the defendant has failed to establish that the trial court's decision precluding him from questioning Nixon regarding his statements to the investigating officer was clearly untenable or unreasonable to the prejudice of his case. *See State v. Kornbrekke*, 156 N.H. 821, 824-25 (2008); *see also Brum*, 155 N.H. at 413. We similarly reject the defendant's argument that the trial court violated his State constitutional rights by denying him the opportunity to make a threshold level of inquiry on a proper matter of inquiry; that is, Nixon's untruthfulness. *See Brum*, 155 N.H. at 416; *Miller*, 155 N.H. at 254. The defendant makes the identical arguments under the Federal Confrontation Clause, without engaging in a separate federal analysis. *But see Miller*, 155 N.H. at 255-56. Thus, we reach the same result under the Federal Constitution.

## II

The defendant next argues that the trial court violated his rights to due process and a fair trial under Part I, Article 15 of the State Constitution and the Fifth and Fourteenth Amendments to the Federal Constitution by failing to give a curative instruction when the State misstated the law to the jury. He contends that during its closing argument, the State misstated the law in two material respects: (1) it "told the jury that it could use the fact that [the defendant] was charged with an offense involving dishonesty as a

basis to assess his credibility"; and (2) it "conveyed that [the jury] could find [the defendant] guilty if it found [his] testimony not credible[,] . . . relieving the prosecution of its burden to prove each element of the offense beyond a reasonable doubt." We first consider the defendant's constitutional arguments under the State Constitution, referring to federal decisions only for guidance. *See Ball,* 124 N.H. at 231-33.

The defendant points to the following excerpts of the State's closing:

> Isn't what this case really comes down to, the defendant's credibility? After all, *isn't he the one charged with lying here, lying to the police, making a false written statement, making a false oral statement to the police?* Walking into Officer Jackson that day and flat out lying. That's what it's about.
>
> . . . .
>
> We talked about credibility. Defense counsel, again, it's all about Nixon and Leavitt. Well, wasn't it really all about the defendant? Isn't that what we're here to decide? *After all, he's charged with lying.* And might it be pertinent, his credibility, whether or not you thought he was telling the truth up there on that stand? Whether or not he is to be believed?

(Emphases added.) He particularly relies upon the emphasized language to argue that the State "erroneously plac[ed] evidentiary value on [the defendant's] arrest and charge."

To support his argument that the State impermissibly shifted the burden of proof to him, he points to the following statements in the State's closing:

> The defendant wants you to believe . . . that his best friend, good friend Jay Nixon steals out of his front yard, steals this tractor, this piece of equipment he thinks is worth ten, fifteen grand, and manages thereafter to hide it from him for a year and a half. That's his story. *To find him not guilty, you have to believe that story.*

(Emphasis added.) Again, he particularly relies upon the emphasized language. In objecting to the State's closing, the defendant requested that the trial court re-instruct the jury that (1) the charging instruments were not evidence of guilt, and (2) the burden of proof rested with the State. The trial court rejected the defendant's characterization of the State's closing argument, and denied his request for re-instruction, ruling that the jury instructions previously given adequately covered the legal issues that the defendant identified.

■ "A prosecutor has great latitude in closing argument to both summarize and discuss the evidence presented to the jury and to urge the jury to draw inferences of guilt from the evidence." *State v. DiNapoli*, 149 N.H. 514, 520 (2003) (quotation and ellipsis omitted). However, certain improper comments made by a prosecutor during closing statements may implicate a criminal defendant's due process rights. *See State v. Parker*, 142 N.H. 319, 322 (1997); *cf. State v. Watkins*, 148 N.H. 760, 769 (2002) (curative instruction appropriate where prosecutor "blatantly misstated the law"). Assuming, without deciding, that the defendant raised a constitutional argument before the trial court, *see DiNapoli*, 149 N.H. at 520, we conclude that the defendant has failed to establish that the trial court erred in refusing his request to re-instruct the jury.

■ We agree with the trial court that the State's closing remarks did not communicate to the jury that the charging instruments had evidentiary value. Rather, the purpose of the challenged remarks, when taken in context, was to counter defense counsel's attempt to deflect the jury's focus from the defendant's credibility, and urge the jury to refocus on that issue. The State pointed out only that the defendant was the person who stood charged with making false statements to the police, and emphasized that the jury's "job . . . [was] to determine [whether the defendant] was lying that day [that he reported his tractor as stolen]." It did not tell the jury that it could use the fact that the defendant was charged with crimes as evidence of guilt.

Further, the State did not impermissibly shift the burden of proof to the defendant. Viewed in context, the State was remarking on the credibility contest between Nixon and the defendant, two key witnesses who had testified to diametrically opposed accounts of the defendant's involvement with the tractor in 2005 and 2006. We reject the defendant's characterization of the State's remarks as somehow communicating to the jury that if it disbelieved the defendant, it could find him guilty without regard to whether the State established guilt beyond a reasonable doubt based on the evidence presented. Throughout the State's closing, it argued the defendant's guilt based upon the evidence it presented that the defendant knew where the tractor was when he reported it to the police as stolen.

Moreover, we note that before closing arguments, the trial court instructed the jury that: (1) when reaching a verdict, it was required to follow and apply the law given to it by the court; (2) the mere fact that a defendant has been charged with a crime or crimes was not evidence of guilt and could not influence the jury's decision in reaching a verdict; (3) if counsel made statements about the law that differed from the judge's instructions, the jury was "duty bound" to follow the judge's instructions;

(4) all defendants in criminal cases are presumed innocent, and the State had the burden of proving each element of the charged crime beyond a reasonable doubt; and (5) the jury had to decide the credibility of the witnesses. We conclude that the State did not misstate the law in its closing and that the defendant failed to establish that the trial court erred when it refused to re-instruct the jury on the law covered during the general instructions. The defendant makes the identical arguments under the Federal Confrontation Clause, without engaging in a separate federal analysis; thus, we reach the same result under the Federal Constitution.

## III

Finally, the defendant argues that the trial court erred in denying his motion to dismiss the unsworn falsification charge because the facts alleged in the complaint, and the evidence presented against him, cannot sustain a conviction under RSA 641:3, I, as a matter of law. The defendant contends that the form he completed (which provided notice that false written statements are punishable under RSA 641:3 for unsworn falsification) was not generated by an entity "authorized by law" to produce forms with such notification. *See* RSA 641:3, I. According to the defendant, because no statutory provision or administrative rule "specifically authorizes municipal police to create forms that make false written statements of suspects or witnesses punishable under unsworn falsification," the evidence proffered by the State did not give rise to an offense under RSA 641:3, I. The State agrees with the defendant and requests that we reverse the defendant's conviction on the unsworn falsification charge. We agree with the parties' interpretation of the statute.

Our standard for statutory construction is well-established. To determine the meaning of a statute, we first examine its language and ascribe the plain and ordinary meaning to the words used. *State v. Lamy*, 158 N.H. 511, 515 (2009); *see* RSA 21:2 (2000). We interpret legislative intent from the statute as written and will neither consider what the legislature might have said nor add language that the legislature did not see fit to include. *Lamy*, 158 N.H. at 515. We also interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.* Our goal is to apply statutes in light of the legislature's intent in enacting them and the policy sought to be advanced by the entire statutory scheme. *State v. Jennings*, 159 N.H. 1, 3 (2009). RSA 641:3, I, is a provision within the Criminal Code; we therefore construe it according to the "fair import of its terms and to promote justice." RSA 625:3 (2007). We are the final arbiters of the legislative intent as expressed in the words of the statute considered as a whole. *Jennings*, 159 N.H. at 3 (quotation omitted).

■ RSA 641:3, I, provides: "A person is guilty of a misdemeanor if . . . [h]e or she makes a written or electronic false statement which he or she does not believe to be true, *on or pursuant to a form bearing a notification authorized by law* to the effect that false statements made therein are punishable . . . ." (Emphasis added.) The phrase "notification authorized by law" plainly indicates that notification on a form, warning that false statements are punishable as unsworn falsification, must be "authorized by law." In other words, if such a form's notification is not "authorized by law," the State has no power under RSA 641:3, I, to subject a person to criminal prosecution for making a false statement on or pursuant to the form.

Several statutory provisions authorize prosecution for unsworn falsification of persons who make false statements on or pursuant to a form bearing such notification. For example, RSA 260:42, II (Supp. 2010) expressly provides, "A transporter[] [of motor fuel or products] license may be obtained by filing an application with the commissioner, on such form as the commissioner may prescribe. *Falsification of the application shall be subject to prosecution for unsworn falsification.*" (Emphasis added.) Similarly, RSA 417-A:3-b (2006) requires applicants seeking automobile insurance coverage to "sign a statement of residency . . . form prescribed by the insurance department," RSA 417-A:3-b, III, and provides, "A person who falsely attests to the statement of residency . . . shall be subject to prosecution for unsworn falsification under RSA 641:3, and, upon conviction, to imposition of the maximum fine without suspension or diminution, along with other penalties authorized by law," RSA 417-A:3-b, I.

■ The State concedes that it is unaware of any provision of law authorizing municipal police to create forms which state that making false written statements on the form is punishable as unsworn falsification under RSA 641:3, I. Therefore, while it is a crime to deceive and to provide false information to a police officer, *see* RSA 641:3, II (2007); RSA 641:4 (2007), the defendant's unsworn falsification conviction under RSA 641:3, I, must be reversed.

*Affirmed in part; and reversed in part.*

DALIANIS, C.J., and DUGGAN, HICKS and CONBOY, JJ., concurred.