Hillsborough-northern judicial district
No. 2011-076

## THE STATE OF NEW HAMPSHIRE

v.

## BRYAN ALWARDT

Argued: April 11, 2012
Opinion Issued: August 17, 2012

*Michael A. Delaney,* attorney general (*Susan P. McGinnis,* senior assistant attorney general, on the brief and orally), for the State.

*Stephanie Hausman,* assistant appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, J. Following a jury trial in Superior Court (*Garfunkel,* J.), the defendant, Bryan Alwardt, was convicted of second degree assault and criminal restraint based on accomplice liability principles.[1] *See* RSA 631:2, I(c) (2007 & Supp. 2011); RSA 633:2 (2007); RSA 626:8 (2007). On appeal, he argues that the trial court erred in: (1) failing to dismiss the assault charge due to insufficient evidence; (2) failing to dismiss the criminal restraint charge as against the weight of the evidence; (3) not ordering disclosure of all of the victim's counseling records; and (4) prohibiting cross-examination of the victim regarding certain drugs found in her boyfriend's apartment. We affirm.

I

Viewed in the light most favorable to the State, *see, e.g., State v. Sideris,* 157 N.H. 258, 263 (2008), the evidence presented at trial established the following pertinent facts. In 2006, Kelley King often visited her drug dealer, Robert Boudreau, and Boudreau's girlfriend, Stephanie Nutter, at Boudreau's home in Nashua. However, King stopped seeing them at the end of July after Boudreau sexually assaulted her.

---

[1] The defendant was originally charged with one count of second degree assault, one count of criminal restraint, two counts of first degree assault, four counts of kidnapping, and one count of conspiracy to commit first degree assault. Prior to trial the State dismissed two of the kidnapping charges, and at trial the court dismissed the other two kidnapping charges. The jury found the defendant not guilty of the two first degree assault charges and the conspiracy charge.

Later in 2006 and 2007, King visited friends at an apartment on the second and third floors of 33 Dionne Drive in Manchester. David Storrs, Carl Lynn and his girlfriend, and the defendant lived in the apartment. Michael Hutchins also stayed there from time to time. In April 2007, King began dating Hutchins, and sometimes stayed with him at the apartment. King did not always get along with Hutchins' roommates, including the defendant.

On April 14, 2007, King was at Boudreau's home when several armed men entered the house and robbed, sexually assaulted, and shot at Boudreau. The intruders put a gun to King's head and took her necklace, but she was not otherwise injured and left the apartment a few minutes later. Boudreau believed that King was responsible for the attack.

On May 8, 2007, King was at 33 Dionne Drive. At some point Lynn called Boudreau and told him that King was at the apartment. Boudreau, Nutter, and another friend, Andrea Dunlop, then drove to 33 Dionne Drive. When they arrived, Lynn met them downstairs. Nutter grabbed a baton from the car and Lynn led them upstairs to the third floor porch where the defendant and several other people were standing.

When Boudreau, Nutter, and Dunlop encountered King inside the apartment, Boudreau immediately accused her of setting up the April 14 robbery. When she tried to respond, he punched her in the face and she fell to the floor. Boudreau, Nutter, and Dunlop then repeatedly punched and kicked King, beat her with the baton, and hit her with a gun. As this occurred, Boudreau accused King of knowing who was responsible for the robbery, said he wanted answers, and told her to stop lying. Boudreau also ripped King's necklace off, saying she had to start paying him back for the robbery. When the altercation started, the defendant remained seated drinking a beer.

Neighbors called the police after hearing screams and what sounded like a gunshot coming from the apartment. Several officers arrived shortly thereafter.

When the defendant saw that the police were outside, he shut the windows and shades and told Boudreau and his companions to "choke out" King to keep her quiet. They asked for something with which to tie up King, and the defendant went into another room and came back with tape and ACE bandages. Nutter and Dunlop taped King's ankles and wrists, but the tape kept breaking so the defendant retrieved some electrical cords. The cords were wrapped around King's ankles, wrists, and neck. Nutter and Dunlop stuck their hands in King's mouth in an effort to keep her quiet, and Nutter tried to rip her tongue out with a metal tool given to her by the defendant.

When these efforts were unsuccessful in keeping King quiet, Boudreau picked her up and, with the defendant holding her legs, brought her into the bathroom and tried to close the door. Boudreau continued to assault King in the bathroom and the defendant attempted to put a sock in her mouth. Dunlop hid the baton under the bathroom sink. The defendant told Dunlop to turn on the Jacuzzi to drown out King's screams because the police were trying to enter the apartment; Nutter and the defendant also opened the water faucets and the defendant then left the bathroom.

The defendant went to the third floor porch where he encountered the police, who took him into custody. Thereafter, several officers entered the apartment where they forced the bathroom door open and found King on the floor, with Nutter and Dunlop standing close by and Boudreau trying to hide. King, who was hysterical, had cords, tape, and bandages wrapped around her ankles, wrists, and neck, and was covered in bruises. Boudreau, Nutter, and Dunlop were arrested. As King was being taken to an ambulance, she saw the defendant and said, "[Y]ou watched them as they beat me. You sat there and did nothing and helped them tie me up."

When interviewed by the police, the defendant said that he had been in his bedroom when he heard King scream, that when he went upstairs to investigate he saw three people he did not recognize kneeling near the bathroom, and that he then went outside because someone said the police were there.

II

The defendant first argues that the evidence was legally insufficient to support the jury's finding that he was guilty as an accomplice to second degree assault. To prevail on this claim, the defendant must establish that no rational trier of fact, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State, could have found guilt beyond a reasonable doubt. *See State v. Young*, 159 N.H. 332, 338 (2009). In reviewing the record to establish if this burden has been met, we do not examine each evidentiary item in isolation, but rather in the context of all the evidence presented. *See id.* "Circumstantial evidence may be sufficient to support a finding of guilty beyond a reasonable doubt." *Id.* "Further, the trier [of fact] may draw reasonable inferences from facts proved and also inferences from facts found as a result of other inferences, provided they can be reasonably drawn therefrom." *Id.*

The defendant was convicted of being an accomplice to second degree assault. RSA 631:2, I(c) makes it a crime to "[r]ecklessly cause[] bodily injury to another under circumstances manifesting extreme indifference to the value of human life." The indictment charging the defendant alleged that the bodily injury was caused by "repeatedly" striking King with

"hands, feet and objects." Thus, for the defendant to be guilty as an accomplice, the evidence must have been sufficient to establish: (1) that one or more of the principal offenders (Boudreau, Dunlop, and Nutter) caused bodily injury to King by striking her with hands, feet, and objects; (2) that the defendant aided or agreed or attempted to aid the principal offenders in the conduct of striking King with hands, feet, and objects; and (3) that the defendant acted recklessly with extreme indifference to the value of human life regarding the risk that bodily injury to King would be caused by the conduct he aided. *See* RSA 626:8, III, IV; *State v. Rivera*, 162 N.H. 182, 188 (2011); *State v. Anthony*, 151 N.H. 492, 495 (2004).

The defendant does not dispute that King was assaulted by Boudreau, Dunlop, and Nutter in the manner alleged in the indictment. Rather, he points to the absence of evidence that he either participated in planning the attack or joined in the assault at its outset. He argues that the evidence showed that he assisted Boudreau, Dunlop, and Nutter only in their attempt to keep King quiet when the police arrived on the scene, and asserts that because this conduct occurred after the assault was over, his participation in such activity does not make him an accomplice to the assault itself. We are not persuaded.

The defendant's argument is based on a faulty premise — that the assault charged in the indictment was limited to the striking of King which occurred prior to the time he rendered aid and assistance to the primary assailants. The indictment, however, was not so limited; rather it encompassed bodily injury caused by the "striking with hands, feet and objects" that occurred throughout the criminal episode. And, contrary to the defendant's claim, there was ample evidence that the assault of King was ongoing at the time the defendant began to provide aid and assistance to the principal assailants. For example, King testified that it was while she was being beaten by Boudreau, Dunlop, and Nutter that the defendant told the trio to choke her to stop her from screaming, and "[t]hat's when they asked for stuff to tie me up." King also testified that, after the defendant complied with this request by providing cords, tape, and ACE bandages, Boudreau and one of the women whipped her with the cords. In addition, King said that after the defendant assisted the other assailants in bringing her into the bathroom, Boudreau "repeatedly smashed my head in between the toilet seats," "punch[ed] me in the face, [and] smash[ed] my face off the floor."

In short, based on the evidence, the jury readily could have found that when the defendant provided aid and assistance to Boudreau, Dunlop, and Nutter, their assault on King was not a completed crime, but a work in progress. The evidence also was sufficient to permit a rational fact finder to

determine that the defendant could reasonably have foreseen that King would sustain further bodily injury as a consequence of his acts of aid and assistance to the other assailants, and that, in undertaking such conduct, the defendant acted recklessly with extreme indifference to the value of human life. *See Rivera*, 162 N.H. at 187, 190. Under these circumstances, the fact that the defendant may not have been an active participant in the criminal venture from the outset does not shelter him from accomplice liability. *See United States v. Figueroa-Cartagena*, 612 F.3d 69, 75 (1st Cir. 2010) ("[W]hen the criminal conduct extends over a period of time, a latecomer may be convicted of aiding and abetting even if [she] did not learn of the crime at its inception but knowingly assisted at a later stage." (quotations omitted)), *cert. denied*, 131 S. Ct. 2930 (2011); *United States v. James*, 998 F.2d 74, 79-81 (2d Cir. 1993) (defendant who learned of bank robbery only during the escape phase and assisted in the escape may be convicted of aiding and abetting the robbery).

■ The defendant also points to the fact that Dunlop and Nutter, who testified at trial pursuant to plea agreements with the State, offered testimony that conflicted with King's concerning some of the acts which King testified were committed by the defendant. However, evaluation of witness credibility, resolving conflicts in the testimony, and determining the weight to be given to the evidence are matters within the province of the jury. *State v. Oakes*, 161 N.H. 270, 276 (2010). We cannot say that no rational jury could have credited King's version of the defendant's actions.

### III

■ At the close of the State's case, the defendant moved to dismiss the criminal restraint indictment, arguing that a conviction on this charge would be against the weight of the evidence. The trial court denied the motion, and the defendant now seeks to assign such denial as error. However, as we recently held in *State v. Hill*, 163 N.H. 394, 396 (2012), "the nature of a challenge to the weight of the evidence requires that it be raised as a motion to set aside a verdict *actually rendered*." Because the relief requested by the defendant was dismissal of the indictment rather than a new trial and because his challenge was made at the close of the State's case rather than after the jury returned its verdict, we conclude that this issue was not properly preserved for our review. *See id.*

### IV

Prior to trial, the trial court conducted an *in camera* review of King's counseling records. *See State v. Gagne*, 136 N.H. 101 (1992). After that review, the court ordered that certain portions of the records be redacted prior to being disclosed to the parties.

On appeal, the defendant asserts that the trial court "may have erred in failing to disclose all of [King's] counseling records," and requests that we independently review the records to determine whether any portions not produced deprived the defendant of his constitutional rights under Part I, Article 15 of the State Constitution and the Fifth, Sixth, and Fourteenth Amendments to the Federal Constitution. The defendant contends that his theory of defense was that King had "confabulated her memories of his involvement in the assault," and was especially susceptible to having done so "because of her history of drug use and because she felt betrayed and angry that [the defendant] had not helped her during the attack." Accordingly, he argues that any information contained in the counseling records that casts doubt on King's "ability to form and recall memories, including information about drug use or her mental health" should have been disclosed to the defense.

 Based on our review of the counseling records in question, we are satisfied that the withheld portions of the records contain no information that would have been of assistance to the defense and that the trial court sustainably exercised its discretion in ordering the records redacted prior to disclosure. *See State v. Guay*, 162 N.H. 375, 385 (2011); *accord Com. v. Feliciano*, 816 N.E.2d 1205, 1209 (Mass. 2004) (where defendant makes sufficient showing to obtain *in camera* review of privileged records by trial court, appellate court reviews trial court decision to withhold some records from disclosure under abuse of discretion standard); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

## V

Finally, the defendant argues that the trial court erred in prohibiting him from cross-examining King regarding certain drugs found in the apartment where the attack occurred.

The facts bearing on this issue are as follows. During a search of the apartment, the police found weapons, gang-related materials, and "lots of drugs," including marijuana located in the bedroom King sometimes shared with her boyfriend, Hutchins.[2] King admitted that she had smoked marijuana and that some of the marijuana found in the bedroom was hers, and she was granted immunity by the State with respect to this marijuana. During a pretrial deposition, King indicated that the defendant had some involvement with drugs. Subsequently, the court granted the defendant's motion to preclude the State from introducing at trial any evidence of his alleged drug activity.

---

[2] Prior to trial, King and Hutchins were married.

Hutchins also initially admitted to the police that at least some of the marijuana found in the bedroom belonged to him, and, in connection with a pretrial deposition of Hutchins requested by the defense, the State granted him immunity with respect to this marijuana. However, during the deposition, in response to questions about the other drugs, weapons, and gang materials found in the apartment, Hutchins asserted his privilege against self-incrimination. Because the deposition led the State to conclude that Hutchins could not offer significant evidence pertaining to the assault, the State decided not to call him as a trial witness, and, therefore, declined to grant him any further immunity.

The defendant then moved to immunize Hutchins so that he could be called as a defense witness and questioned about all the drugs and other items found in the apartment. The defendant argued that this was necessary because Hutchins' susceptibility to being charged with crimes arising out of the items found in his apartment provided a motive for King to falsely implicate the defendant in the assault. Specifically, the defense theory was that by implicating the defendant, King hoped to divert police attention from Hutchins and "keep him part of . . . the protective umbrella that's given by [King's] victim status."[3] Following a hearing, the court denied the motion to further immunize Hutchins.

Just prior to King's testimony at trial, the State advised the court that King had been instructed that "she can't talk about anything to do with [the defendant] and drugs." The State noted its expectation that the defense would cross-examine King about the marijuana as to which she had been granted immunity, and sought to preclude the defense from cross-examining her about any other drugs found in the apartment on the ground that such evidence was irrelevant and "far more prejudicial than probative." The defendant asserted that he should be able to cross-examine King regarding drugs found in the room she shared with Hutchins. Referencing the earlier hearing on Hutchins' immunity motion, defense counsel asserted that his relevancy argument was similar to the one made at that hearing — "we think that her knowledge of the existence of drugs and the possession of her then boyfriend, now husband may color her participation in the investigation of this case and statements that she made." The court rejected the defendant's request, stating, "I just don't see any nexus and . . . it's not probative of anything and . . . [it] obviously tends to color the case without any connection to the charges themselves."

As the above recitation indicates, the defendant clearly articulated for the trial court the theory upon which he sought to elicit evidence from King

---

[3] The defendant invoked his rights to a fair trial, effective assistance of counsel, confrontation, and due process under the State and Federal Constitutions in support of his argument.

about the drugs, other than her own, that were found in the apartment. Thus, we reject the State's contention that this issue is not properly preserved for appeal. *See State v. Ayer*, 150 N.H. 14, 21 (2003) ("When trial courts have an opportunity to rule on issues and to correct errors before they are presented to the appellate court, the preservation requirement is satisfied.").

On the merits, however, we find that the trial court sustainably exercised its discretion in precluding the expanded cross-examination of King regarding drugs, other than her own, found in the apartment. *See State v. Ainsworth*, 151 N.H. 691, 696 (2005) (trial court's evidentiary rulings are reviewed under unsustainable exercise of discretion standard and will be upheld unless defendant demonstrates that they were clearly untenable or unreasonable to the prejudice of his case).

■ Initially, we note that the theory of relevancy proffered by the defendant is hardly compelling. It may be plausible that King had a motive to keep Hutchins under the "protective umbrella of her status as a victim." It strains credulity, however, that she could have thought falsely implicating the defendant, not in the possession of drugs (which she plausibly could have thought would otherwise be attributed to Hutchins), but in a completely separate crime — the assault — would further this objective. This is particularly so given that King never claimed that the defendant was a major player in the assault — that status clearly fell upon Boudreau, Dunlop, and Nutter. Consequently, to the extent that King was motivated to protect Hutchins by keeping the focus on her victim status, she could accomplish this simply through providing evidence against these three major players without any need to embellish the role of a minor player (the defendant) in the venture. Furthermore, insofar as the defendant suggests that King may have wanted to protect Hutchins because she feared the police would want to hold someone who was a resident of the apartment (thus excluding Boudreau, Dunlop, and Nutter) responsible for the drugs, weapons, and other items of a criminal nature located therein, this theory could not have been fairly pursued before the jury by exposing *only* the drugs (other than King's) found in Hutchins' bedroom. Rather, to avoid leaving the jury with a misleading impression concerning the strength of King's putative motive to protect Hutchins, the trial court could well have assumed that had it allowed King to be cross-examined about drugs located in Hutchins' bedroom, the State would have sought to explore on redirect all the drugs and other materials located *throughout the apartment* — a request the court would likely have had to grant.[4] *Cf. State v. White*, 155

---

[4] We observe here that, based on the record before us, it does not appear that King ever specifically acknowledged before trial that the drugs other than her own that were found in

N.H. 119, 124 (2007) (specific contradiction doctrine is applicable "to situations in which one party has introduced admissible evidence that creates a misleading advantage and the opponent is then permitted to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage"). In sum, balanced against the minimal probative value of the drug evidence in question, the trial court could readily have found that its potential to confuse the issues and mislead the jury was sufficient to require its exclusion. *See* N.H. R. Ev. 403.

■ We also are not persuaded by the defendant's arguments that denial of cross-examination regarding the drugs found in Hutchins' bedroom violated his rights under Part I, Article 15 of the State Constitution or the Confrontation Clause of the Sixth Amendment. Following our standard practice, we first consider the defendant's arguments under the State Constitution, referencing federal decisions to aid our analysis only. *State v. Ball*, 124 N.H. 226, 231-33 (1983). As we recently explained:

> The opportunity to impeach a witness's credibility through cross-examination is an incident of rights guaranteed by part I, article 15 of the State Constitution. Cross-examination provides the defendant a right to meet the witnesses against him face to face, and be fully heard in his defense. This includes the right to expose the possible biases of witnesses.
>
> The trial court has broad discretion to fix the limits of proper areas of cross-examination, including attacks upon a witness's credibility. The trial court, however, may not completely deny a defendant the right to cross-examine a witness upon a proper matter of inquiry and must permit sufficient cross-examination to satisfy a constitutional threshold.

*State v. Stowe*, 162 N.H. 464, 467 (2011) (quotations and citations omitted).

■ In this case, the defendant was given ample opportunity to challenge King's credibility and expose her bias. Defense counsel extensively examined her about numerous inconsistencies between her trial testimony and various statements she made before trial, including, in particular, that she had initially said the defendant merely stood by while she was attacked. Defense counsel also (1) elicited that in her first interviews with police, King would talk only about the assault and would not answer questions about "other issues" as to which they inquired, (2) established that King

---

Hutchins' bedroom belonged to Hutchins. Thus, the defendant could not and did not represent to the trial court that if King were asked about these drugs, she would say they belonged to Hutchins (as opposed to saying they belonged to the defendant or some other occupant of the apartment).

had possessed and used marijuana on the morning of the day the assault occurred and had been given immunity for this conduct, and (3) reviewed her lengthy history of drug abuse, which began at age nine and included use of marijuana, LSD, cocaine, ecstasy, angel dust, crystal methamphetamine, and PCP. Based on this evidence, as well as the testimony of a defense memory expert, defense counsel was able to fashion a cogent closing argument suggesting that King was biased against the defendant, not because he participated in the assault, but merely because he did not come to her aid during the assault, and that her memory of the defendant's role in the assault was clouded not only by this bias but also because of the traumatic nature of the assault and her memory deficits owing to her longtime drug usage. Considering the record as a whole, we cannot say that the trial court denied the defendant a constitutionally adequate level of cross-examination exposing issues bearing on King's credibility and bias. *See Stowe*, 162 N.H. at 470-71. Because our State Constitution is at least as protective in this area as the Federal Constitution, *see State v. Bashaw*, 147 N.H. 238, 242 (2001), we also find no violation of the defendant's federal constitutional rights.

*Affirmed.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.