Belknap
No. 2012-467

### THE STATE OF NEW HAMPSHIRE

v.

### JASON DURGIN

Argued: September 26, 2013
Opinion Issued: December 6, 2013

726

*Joseph A. Foster*, attorney general (*Benjamin J. Agati*, assistant attorney general, on the brief and orally), for the State.

*Brianna M. Sinon*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DALIANIS, C.J. The defendant, Jason Durgin, appeals his convictions for second degree assault (as a lesser included offense of manslaughter) and negligent homicide following a jury trial in Superior Court (*O'Neill*, J). *See* RSA 630:3, I, :2 (2007); RSA 631:2 (Supp. 2013). He argues that the trial court erred by: (1) denying his request to admit evidence of alternative perpetrators; (2) precluding him from cross-examining a witness about using his electronic benefits (EBT) card without his permission; and (3) denying his motion to set aside the verdict as conclusively against the weight of the evidence. We affirm.

## I. *Background*

The jury could have found the following facts. In the late morning of May 3, 2011, Tracy Hebert called the police to the defendant's trailer, where she had been living with the defendant and Gary Fields. Approximately thirty feet from the trailer's front stairs lay the victim, Leo Lapierre, "slumped up against . . . a wooden picket fence." He was unconscious, unresponsive, bloody, and covered "from head to toe" in "thick, thick dirt" and vomit. The police knocked loudly on the door to the trailer, but neither the defendant nor Hebert responded. Fields had left the trailer earlier that morning. When emergency medical personnel arrived on the scene, Lapierre was still breathing; however, when he was intubated, blood poured from his mouth.

Lapierre's left eye was swollen shut and noticeably bruised. Additionally, he had a bloody head wound. Lapierre was transported to Lakes Region General Hospital for treatment.

Despite repeated entreaties from the police, the defendant and Hebert did not exit the trailer for thirty minutes after the police arrived. Hebert told the police that Lapierre was homeless and had been staying at the defendant's trailer for three or four days. Hebert described him as a "very thin . . . older gentleman," who was "quiet and polite" and appeared to be "really frail."

Hebert told police that during the night before, she heard the defendant swearing at Lapierre about damaging the water tank in the bathroom. When she emerged from her bedroom to see what the commotion was about, she saw the defendant push Lapierre down the hallway toward the kitchen. She then saw the defendant punch Lapierre in the face, "knock-[ing] him out." While Lapierre was lying on the kitchen floor, Hebert saw the defendant kick him on the side of his head with enough force that the other side of his head hit a nearby kitchen cabinet. The defendant ordered Hebert to go back to her room and mind her own business. Hebert returned to her room, but then heard the defendant use profanity and demand that Lapierre leave. Hebert heard struggling, as if the defendant were throwing Lapierre out of the trailer. Hebert then heard the front door shut and the defendant yell, "Do not open that door for nobody."

Hebert woke at approximately eleven o'clock the next morning to find Lapierre lying outside the trailer. His face was "swollen . . . and all gray." Hebert yelled at Lapierre, but he did not respond. The defendant, who was at Hebert's side, asked Hebert and another person to "help him move [Lapierre] inside." When Hebert refused, she saw the defendant move Lapierre "over to the fence and prop him up because . . . he was choking." Hebert returned to the trailer and called 9-1-1, telling the operator that there was a homeless man "[a]ll dirty and beat up" in the yard. The police arrested the defendant later that day. Lapierre died approximately one week later.

At trial, Fields partially corroborated Hebert's account of the assault, testifying that he had found Lapierre in the bathroom near the damaged water tank. While Fields cleaned the bathroom, he heard the defendant "screaming and yelling" obscenities at Lapierre for damaging the water tank. He then heard "a couple thumps, like somebody falling on the floor or something like that." A few minutes later, he saw Lapierre lying on his back on the kitchen floor with the defendant standing over him. At the defendant's request, Fields helped the defendant pick up Lapierre and deposit him on the steps of the trailer, outside the front door.

## II. *Discussion*

### A. *Evidence of Alternative Perpetrators*

Before trial, the defendant moved *in limine* to introduce evidence to establish that someone other than he had killed Lapierre. Specifically, the defendant sought to admit evidence that: (1) on April 29, 2011, a few days before the assault on Lapierre, John Petrocelli assaulted Gerald York inside the defendant's trailer; and (2) Gerald and Robert York later came to the trailer, seeking revenge for the April 29 assault. The State objected to admission of the evidence under New Hampshire Rules of Evidence 403 and 404(b). The trial court denied the defendant's motion as follows:

> In this case, the Court finds that evidence that Jerry York was assaulted at the defendant's trailer and that Jerry and Bob York had been coming to the defendant's trailer seeking revenge for that assault is irrelevant. There is no evidence that Mr. Lapierre was present when Mr. York was allegedly assaulted or was present at the residence when either of the Yorks returned to the residence. In fact, the defendant has presented no evidence of any connection or nexus between the Yorks and the alleged victim. Moreover, there is no evidence that the Yorks were committing random acts of violence against people in or around the defendant's trailer. Thus, this evidence has no tendency to make it more or less likely that someone other than the defendant assaulted Mr. Lapierre and is inadmissible.

On appeal, the defendant contends that the trial court unsustainably exercised its discretion when it denied his motion *in limine*. He asserts that the evidence was relevant to show that "Gerald and Robert had the motive and opportunity to assault Lapierre" and that it was admissible under Rule 404(b).

Because the parties do not argue otherwise, we assume, without deciding, that Rule 404(b) applies to alternative perpetrator evidence. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b). "[I]n ruling on the admissibility of evidence under Rule 404(b), the trial court exercises its sound discretion, and we will find error

only if the defendant can show that the ruling was clearly untenable or unreasonable to the prejudice of his case." *State v. Cassavaugh*, 161 N.H. 90, 96 (2010) (quotation omitted).

■ Rule 404(b) typically applies when the State seeks to introduce evidence of other bad acts of a defendant. *State v. Monroe*, 142 N.H. 857, 871 (1998). In such cases, "evidence of other bad acts is only admissible if relevant for a purpose other than to prove the defendant's character or disposition, if there is clear proof that the defendant committed the other acts, and if the prejudice to the defendant does not substantially outweigh the probative value of the evidence." *Id.* (quotation and brackets omitted). "To meet the relevancy requirement of Rule 404(b), there must be a clear connection between the particular evidentiary purpose and the other bad acts." *Id.* (quotation and ellipsis omitted). Thus, in this case, the defendant must show a "clear connection" between the purposes for which he sought to introduce the evidence (motive and opportunity to assault Lapierre) and the Yorks' other bad acts. *Id.*

In analyzing this issue, we find *Monroe* instructive because, like this case, it involves applying Rule 404(b) to alternative perpetrator evidence. In *Monroe*, the defendant sought to show that his son had a motive to kill the victim by presenting evidence of the son's past drug use and thefts from the victim to support his drug habit. *Id.* at 870. The defendant theorized that because the son had stolen from the victim (his grandmother) on several prior occasions to support his drug habit, on the night of the murder he was attempting to steal again when she interrupted the theft, and he killed her. *Id.* at 870-71. The trial court ruled that this evidence was irrelevant and, therefore, inadmissible under Rule 404(b). *Id.* at 871. We concluded that, in so ruling, the court did not unsustainably exercise its discretion. *Id.* at 871-72. Although the defendant contended that the son's drug use was relevant to show a motive to kill the victim, we disagreed: "Evidence of [the son's] past drug use alone is irrelevant to show [the son's] motive to murder." *Id.* at 872. Although the defendant argued that the son's past thefts from the victim to support his drug habit were relevant to show motive, we concluded that absent any evidence of a nexus between the thefts and the murder, the evidence was irrelevant. *Id.*

■ In the instant case, the alleged nexus between the Yorks' prior bad acts and Lapierre's murder is more attenuated than the alleged nexus in *Monroe* between the son's drug use and past thefts and his grandmother's murder. In *Monroe*, the son had previously committed other crimes against the murder victim. Here, there was no evidence of any connection between the Yorks and Lapierre.

In addition, just as there was no nexus in *Monroe* between the son's motive to steal from the victim and his alleged motive to murder her, here there was no nexus between the Yorks' motives to seek revenge on Petrocelli and a motive to assault Lapierre. Although the defendant presented evidence that Gerald told him, "If you had anything to do with [the assault on me], I'm going to come see you personally," at best, this suggests a motive to assault the *defendant*, not a motive to assault Lapierre. Because the defendant did not establish the requisite nexus between the Yorks' prior bad acts and the assault on Lapierre, we conclude that the trial court did not unsustainably exercise its discretion when it ruled that the evidence was irrelevant and, therefore, inadmissible.

█ Although the defendant also contends that "[t]he court's error was so prejudicial to [his] defense that his constitutional rights to due process of law, all proofs favorable and the presentation of relevant and exculpatory evidence, fair trial, and effective assistance of counsel were violated," his argument is premised upon his assumption that the trial court erred. Moreover, he has not sufficiently developed it for our review. As we have repeatedly stated, "[j]udicial review is not warranted for complaints regarding adverse rulings without developed legal argument, and neither passing reference to constitutional claims nor off-hand invocations of constitutional rights without support by legal argument or authority warrants extended consideration." *Appeal of Omega Entm't*, 156 N.H. 282, 287 (2007).

Finally, because we rely upon established precedent to resolve this appeal issue, we decline to consider the State's request that we adopt a new rule requiring defendants to show "a *direct* nexus or connection between the alleged alternative perpetrator and the charged crime." (Emphasis added.)

## B. *Cross-Examination of Witness*

In a pre-trial motion *in limine*, the defendant sought permission to admit certain evidence to impeach Hebert's credibility, including her "theft and unauthorized use of his [EBT] card." The defendant asserted that *after* he was arrested and incarcerated for the assault of Lapierre, Hebert took his EBT card and used it, without his permission, to obtain approximately $700 in goods and/or services. He argued that this evidence was relevant to show that Hebert was prejudiced against him and was motivated to lie about him to "curry favor with the police." He explained that Hebert wanted him "to be discredited and to be incarcerated and unable to prosecute her." The evidence, the defendant contended, was "relevant to show . . . Hebert's motive, self-interest and fear affecting the credibility of her testimony." The defendant asserted that this evidence was admissible under evidentiary

rules and that he was constitutionally entitled to pursue this inquiry when he cross-examined Hebert. The State objected, and the trial court denied the defendant's motion.

On appeal, the defendant contends that excluding evidence that Hebert took his EBT card and used it without his permission after he was arrested violated his rights under Part I, Article 15 of the State Constitution and the Confrontation Clause of the Sixth Amendment, *see* U.S. CONST. amends. VI, XIV. Following our standard practice, we first consider the defendant's arguments under the State Constitution and rely upon federal law only to aid our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

■ The opportunity to impeach a witness's credibility through cross-examination is an incident of rights guaranteed by Part I, Article 15 of the State Constitution. *State v. Alwardt*, 164 N.H. 52, 61 (2012). Cross-examination provides the defendant a right to meet the witnesses against him face-to-face and to be fully heard in his defense. *Id.* This includes the right to expose the possible biases and prejudices of witnesses. *Id.*

■ "The trial court has broad discretion to fix the limits of proper areas of cross-examination, including attacks upon a witness's credibility." *Id.* (quotation omitted). However, the trial court may not completely deny a defendant the right to cross-examine a witness upon a proper matter of inquiry and must permit sufficient cross-examination to satisfy a constitutional threshold. *Id.* "Once a defendant has been permitted a threshold level of inquiry the constitutional standard is satisfied, and the trial court's limitation of cross-examination thereafter is measured against an unsustainable exercise of discretion standard." *State v. Stowe*, 162 N.H. 464, 467 (2011) (quotation and brackets omitted). "Thus, when the record reveals that a threshold level of inquiry was allowed, we will uphold the trial court's decision limiting the scope of further cross-examination unless the defendant demonstrates that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Id.* (quotation omitted).

We first consider whether the defendant was permitted a threshold level of inquiry into Hebert's prejudice against him and motive to lie. *See id.* at 469. Hebert was a key witness for the State. She was an eyewitness to the defendant's assault on Lapierre, testifying that she saw the defendant punch Lapierre in the face, "knock[ing] him unconscious," and then, while Lapierre was lying on the floor, kick his head with enough force to cause the other side of his head to hit a nearby cabinet.

■ To impeach Hebert's credibility as a witness, the defendant cross-examined her extensively about the lies she told the police about the incident. For instance, the defendant elicited testimony that Hebert lied in

the 9-1-1 call to the police, telling the police that she did not know the name of the man found outside of the defendant's trailer, that her mother and her ten-year-old son were on their way to pick her up, and that her cellular telephone was "shut-off." The defendant also elicited Hebert's testimony that she lied in her initial oral and written statements to the police.

The defendant also cross-examined Hebert about her faulty memory and compromised mental state. On cross-examination, Hebert admitted that she is, and has been, an alcoholic since she was thirteen years old, and that, in the days preceding the assault, she was drinking half a gallon of vodka daily. Hebert conceded on cross-examination that her alcohol consumption made her perception "cloudy at times." Hebert also admitted that she took illegal drugs, including heroin and prescription drugs that she purchased on the street. Although she took prescription narcotics on the night of the assault, Hebert later lied to the police by telling them that she had only taken a "Tylenol PM." Hebert also admitted that she has suffered twelve concussions and, as a result, has a poor memory "at times," and that she has bipolar disorder for which she takes no medication.

With respect to her motive to "curry favor" with the police, the jury heard on direct examination that Hebert had been previously incarcerated because she had been convicted of felony forgery, and that she was in the county jail at the time of the trial, having been convicted of shoplifting. On cross-examination, Hebert admitted that her prior encounters with the police frightened her.

On this record, we hold that the defendant was allowed a threshold level of inquiry on Herbert's prejudice and motive to fabricate. *See id.* at 469-70. We conclude that the trial court's decision did not "impermissibly limit the defendant's ability to effectively impeach the principal witness against him at trial in violation of Part I, Article 15 of the New Hampshire Constitution." *Id.* at 470 (quotation omitted). The defendant makes the identical arguments under the Federal Confrontation Clause, without engaging in a separate federal analysis. *See id.* Thus, we reach the same result under the Federal Constitution. *Id.* To the extent that the defendant argues that the trial court's decision was clearly untenable or unreasonable to the prejudice of his case, he has failed to persuade us that this is the case.

### C. *Motion to Set Aside Verdict*

█ The defendant argues that he is entitled to a new trial because the verdict was conclusively against the weight of the evidence. "Although a verdict may be supported by sufficient evidence, a trial court may nevertheless conclude that the judgment is against the weight of the evidence." *State v. Spinale*, 156 N.H. 456, 465 (2007) (quotation omitted). Determining the weight of the evidence "is basically a determination of the trier of fact

that a greater amount of credible evidence supports one side of an issue or cause than the other . . . [and] whether the [S]tate has appropriately carried its burden of persuasion." *Id.* (quotations and citations omitted). "Thus, in contrast to sufficiency where we determine whether a rational *juror* could have found guilt, a verdict conclusively against the weight of the evidence is 'one no reasonable *jury* could return.' " *Id.* (quotation omitted).

■ When granting a motion to set aside the verdict as conclusively against the weight of the evidence, the trial court "sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Id.* (quotation omitted). "Thus, a motion addressed to the weight of the evidence primarily presents a question of fact for the trial court, and the trial court has much more discretion when considering such a motion." *Id.* However, because the jury verdict must be one that no reasonable jury could have returned, the trial court must "exercise its discretion with caution and invoke its power to grant a new trial only in exceptional cases in which the evidence preponderates heavily against the verdict" and "where a miscarriage of justice may have resulted." *Id.* at 466 (quotation omitted). "The trial court should not disturb the jury's findings unless the jury clearly failed to give the evidence its proper weight." *Id.*

■ We review a trial court's denial of a motion to set aside the verdict as against the weight of the evidence under our unsustainable exercise of discretion standard. *Id.* In so doing, we give deference to the trial court's decision. *See id.* "After all, the trial judge conducts the trial, observes the witnesses and the jury, and is in a better position than we are to evaluate the whole atmosphere of a trial, much of which cannot be gleaned from that portion of the proceedings that is reducible to a cold record." *Id.* (quotation omitted). "Whether we, sitting as trial judges, would have reached the same or a different result is immaterial." *Id.* (quotation omitted). "In the doubtful cases[,] we should defer to the trial court's judgment." *Id.* (quotation, brackets, and ellipsis omitted).

■ The trial court found that the State carried its burden of persuasion. As it explained:

> Ms. Hebert testified that she witnessed the defendant punch Leo Lapierre in the head causing him to drop unconscious to the ground. She further testified that she saw the defendant kick Mr. Lapierre in the head, causing his head to ric[]ochet off a nearby cabinet. Finally, she testified that she saw the defendant drag Mr. Lapierre to a fence outside the residence. Another witness, Gary Fields, corroborated Ms. Hebert's testimony to the extent that he heard the defendant yelling at Mr. Lapierre about the hot water

tank. Mr. Fields further corroborated Ms. Hebert's testimony by stating that he heard loud thumps echoing through the residence and saw Mr. Lapierre lying on the floor in the same manner described by Ms. Hebert. The State's Medical Examiner testified that Mr. Lapierre's injuries were consistent with Ms. Hebert's testimony. Additionally, photographs and other physical evidence showed that Mr. Lapierre's clothing and body had been dragged through dirt and mud. Thus, a great amount of probative evidence supports the jury's verdict.

Having reviewed the record, we conclude that it establishes an objective basis to support the trial court's decision. Accordingly, we will not disturb that decision. "This is not one of those exceptional cases where the jury failed to give the evidence its proper weight. Rather, this was a classic jury case, in which the jury examined and properly weighed the conflicting evidence to conclude" that the defendant committed second degree assault and negligent homicide. *Id.* at 468.

*Affirmed.*

HICKS, CONBOY, LYNN and BASSETT, JJ., concurred.